Filed 7/24/14

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| TOWN OF ATHERTON et al., | C070877 |
| Plaintiffs and Appellants, | (Super. Ct. Nos. 34200880000022CUWMGDS, 34201080000679CUWMGDS) |
| v. | |
| CALIFORNIA HIGH-SPEED RAIL AUTHORITY, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Sacramento County, Michael P. Kenny, Judge. Affirmed.

Stuart M. Flashman for Plaintiffs and Appellants.

Griswold, LaSalle, Cobb, Dowd & Gin, Raymond L. Carlson, and Laura A. Wolfe for Citizens for California High-Speed Rail Accountability as Amicus Curiae for Plaintiffs and Appellants.

Colleen Carlson, County Counsel (Kings), and Erik Kaeding, Deputy County Counsel (Kings) for County of Kings as Amicus Curiae for Plaintiffs and Appellants.

1

Virginia Gennaro, City Attorney (Bakersfield), and Andrew Heglund, Deputy City Attorney (Bakersfield) for City of Bakersfield as Amicus Curiae for Plaintiffs and Appellants.

Chatten-Brown & Carstens, Jan Chatten-Brown, Douglas P. Carstens, and Josh Chatten-Brown for John Van de Kamp, San Luis Obispo Coastkeeper, Endangered Habitats League, Environmental Water Caucus, Pacific Energy Policy Center, Laguna Greenbelt, Inc., North County Watch, Communities for Sustainable Monterey County, and West County Toxics Coalition as Amici Curiae for Plaintiffs and Appellants.

Wanger Jones Helsley, Oliver W. Wanger, John P. Kinsey, and Daren A. Stemwedel for Preserve our Heritage as Amicus Curiae for Plaintiffs and Appellants.

Chatten-Brown & Carstens, Jan Chatten-Brown, Douglas P. Carstens, and Josh Chatten-Brown for Friends of Eel River, Friends of Rose Canyon, The River Project, Save Our NTC, Inc., and California Native Plant Socity as Amici Curiae for Plaintiffs and Appellants.

Kamala D. Harris, Attorney General, John A. Saurenman and Daniel L. Siegel, Senior Assistant Attorneys General, Danae J. Aitchison and Jessica E. Tucker-Mohl, Deputy Attorneys General for Defendant and Respondent.

Pillsbury Winthrop Shaw Pittman, Michael R. Barr, Kevin M. Fong, and Blaine I. Green for Union Pacific Railroad Company as Amicus Curiae.

California has long contemplated a high-speed rail system connecting its southern and northern regions. In 1996 when the Legislature established defendant California High-Speed Rail Authority (the Authority), it declared the need for an intercity rail system operating at high speeds to complement the existing infrastructure of highways and airports. (Pub. Util. Code, § 185010.) As plans for a high-speed rail system developed, the system's alignment--simply put, where to lay the track--from the Central Valley to the San Francisco Bay Area became an issue. At the heart of the dispute in this case is the Authority's decision that trains travelling between those destinations should travel through the Pacheco Pass rather than further north at the Altamont Pass.

Petitioners challenge the adequacy of the revised final program environmental impact report/environmental impact statement (PEIR/EIS) and the approval of the

2

Pacheco Pass network alternative as the route for the high-speed train (HST) system to connect the San Francisco Bay Area and the Central Valley. They contend the revised final PEIR violates the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.) because it: (1) provides an inadequate analysis of the vertical profile options for alignment--simply put, where to elevate the track--along the San Francisco Peninsula; (2) uses a flawed revenue and ridership model; and (3) has an inadequate range of alternatives, specifically because it rejects an alternative proposed by an expert consulting company (Setec).

After this case was originally calendared for oral argument, the Authority asked us to dismiss it, contending that federal law preempts any CEQA remedy. The Authority makes this argument because a federal board recently assumed jurisdiction over the HST. As we will explain, we need not decide the broader question of federal preemption because we find the specific circumstances of this case establish an exception to federal preemption under the market participation doctrine.

On the merits, we hold the Authority properly used a program EIR and tiering and deferred site-specific analysis such as the vertical alignment to a later project EIR. The challenge to the revenue and ridership modeling presents a disagreement among experts that does not make the revised final PEIR inadequate. The Authority studied an adequate range of alternatives. It was not required to analyze the Setec alternatives because they were infeasible or substantially similar to those already studied. Accordingly, we shall affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

*Alignment of High-Speed Rail from Central Valley to Bay Area:*

*Altamont Pass versus Pacheco Pass*

In 1993, the Intercity High-Speed Rail Commission (Commission) was established to develop a framework for implementation of a high-speed rail system. As part of a study, the Commission considered three mountain passes (the Altamont, the Pacheco, and

3

the Panoche) to link the Central Valley to the San Francisco Bay Area by rail. It recommended the Altamont Pass. "This option generates higher ridership and revenue for the system, and is less costly to construct than the other two mountain passes considered."

In 1996, the Authority was established to continue planning for the high-speed rail system. (Pub. Util. Code, § 185000 et seq.) At the end of 1999, the Authority issued a final report on the corridor evaluation. The report noted the Altamont Pass corridor, which turned west from the Central Valley south of Stockton, had a faster travel time than the Pacheco Pass corridor. It did, however, require a branch alignment, or additional track(s), to provide train service to San Jose, which resulted in less frequent service to both San Francisco and San Jose unless additional trains were provided. Environmental issues included a substantial impact to farmland and impacts to threatened and endangered species.

The Pacheco Pass corridor turned west between Fresno and Merced. The report found it was slower than the Altamont corridor in terms of travel time to San Francisco, but provided faster travel time to San Jose with no need for a branch alignment. "Overall, the Pacheco Pass option would have more negative environmental impacts as compared to the Altamont Pass option." This option could affect low-income and minority populations; there would be more water crossings, there would be impacts to farmland and historic properties, floodplain encroachment, and impacts to threatened and endangered species. The report found the ridership and revenue forecasts were higher for the Pacheco Pass alternative than the Altamont Pass, due to the faster travel times to San Jose and the improved frequency of service to San Jose and either San Francisco or Oakland. Authority staff recommended the Pacheco Pass corridor.

In 2005, the Authority directed its staff to proceed with the preparation of a separate program-level EIR to identify a preferred alignment within the broad corridor between and including the Altamont Pass and the Pacheco Pass for the HST system

4

segment connecting the San Francisco Bay Area to the Central Valley. After receiving over 400 comments on the draft PEIR, in 2008 the Authority prepared a final PEIR/EIS, which identified the Pacheco Pass as the preferred alternative. The Pacheco Pass alternative (1) minimized impacts on wetlands, waterbodies, and the environment; (2) best served the connection between Northern and Southern California; (3) best used the Caltrain Corridor (between San Jose and San Francisco); and (4) was strongly supported by the Bay Area region, cities, agencies, and organizations.

*Challenge to 2008 Final PEIR (Atherton I)*

Petitioners Town of Atherton, Planning and Conservation League, City of Menlo Park, Transportation Solutions Defense and Education Fund, California Rail Foundation, and Bayrail Alliance (collectively Atherton I petitioners) petitioned for a peremptory writ of mandate to set aside certification of the final revised PEIR. The Atherton I petitioners contended the final revised PEIR was inadequate because it failed to include an adequate description of the project and feasible alternatives; it failed to adequately identify and mitigate the project's significant impacts; its alternatives analysis was inadequate and predisposed toward selection of the Pacheco Pass alternative; and the Authority refused to recirculate the draft PEIR after the Union Pacific Railroad announced its opposition to allowing use of its right-of-way.

The trial court found the Atherton I petitioners met their burden of showing certain inadequacies in the final PEIR. These inadequacies related primarily to the project description and the Union Pacific Railroad's opposition to allowing the project to use its right-of-way. The trial court issued a peremptory writ of mandate commanding the Authority to rescind and set aside its resolution certifying the final PEIR/EIS and approving the Pacheco Pass alternative, to set aside other approvals, and to revise the PEIR/EIS (*Atherton I*). The court denied the Atherton I petitioners' request for a stay of project-level environmental studies.

5

The Authority filed an initial return to the writ, indicating the Authority had rescinded its prior approvals relating to the project.

*Petition for Writ of Coram Nobis*

The Atherton I petitioners petitioned for a writ of coram nobis, seeking to vacate the prior judgment. They contended newly discovered evidence that revealed the revenue and ridership modeling was obviously and fatally flawed had been improperly withheld.[1] They asserted that the modeling parameters had been changed because the first results were not acceptable. The Atherton I petitioners provided the opinion of a consultant that the errors in the modeling made the results untrustworthy. In particular, the consultant found the service headway coefficients, which describe the frequency of service, were invalid and favored the Pacheco Pass route.

The trial court denied the petition. It found the Atherton I petitioners failed to establish both that the new evidence would cause a probable different result and that the new evidence could not have been discovered with due diligence. Further, the court found the Atherton I petitioners had an alternate remedy in the CEQA compliance procedure.

*The Revised Final PEIR*

In September 2010, the Authority certified the revised final PEIR as in compliance with CEQA, and approved the CEQA findings of fact and statement of overriding

---

[1] A consultant explained travel modeling: "A travel model is a tool for making predictions about people's travel patterns. A model consists of a series of mathematical equations that produce forecasts of the number, origin and destination, travel mode, and travel route for trips as a function of variables such as population and employment, travel time and cost, fuel costs, rail and airline schedules, and a number of other variables. The mathematical equations in the model include coefficients and constants that describe the importance of each input variable in a traveler's decisions regarding the number of trips, destination, travel mode, and travel route."

6

considerations, and adopted the mitigation monitoring and reporting program. It also approved the Pacheco Pass network alternative.

The Authority filed a supplemental return to the writ. The Authority declared that it had complied with the writ and requested that the writ be discharged.

*Challenges to Revised Final PEIR (Atherton II)*

The Atherton I petitioners objected to the Authority's supplemental return to the writ, contending the Authority had failed to comply fully with the writ. They alleged the revised final PEIR was inadequate for several reasons. First, the project description was inadequate because it included inaccurate ridership and revenue figures from a defective model. Second, the revised final PEIR failed to disclose significant impacts resulting from removing the HST right-of-way from the Union Pacific Railroad right-of-way, especially the impact of the removal of two lanes from the Monterey Highway and the need for a vertical alignment through cities on the Peninsula. Third, the Atherton I petitioners objected to the analysis of alternatives and claimed that new information required recirculation of the PEIR. They explained that a group known as the Altamont Advocates had contracted with a French high-speed rail expert consulting company, Setec, to identify a feasible Altamont Pass alignment. Setec also provided material on the feasibility of a new Dumbarton rail bridge to serve the Altamont Pass route. The Atherton I petitioners complained that the Authority "brushed these new alternatives and the new information aside."

A second group of petitioners included all of the Atherton I petitioners, except Bayrail Alliance, and added the City of Palo Alto, Community Coalition on High-Speed Rail, MidPeninsula Residents for Civic Sanity, and Patricia Hogan-Giorni (the Atherton II petitioners). They petitioned for a writ of mandate, seeking to set aside approvals for the project, including the determination to choose the Pacheco Pass alignment. They raised many of the same points as the Atherton I petitioners.

7

The parties stipulated that the Atherton I case would address whether the Authority complied with the writ, while the Atherton II case would address whether the Authority complied with CEQA in the revised final PEIR.  In addition, those parties who were petitioners in both Atherton I and Atherton II would file a request for dismissal with prejudice from Atherton II.

*The Rulings*

The trial court agreed with the Atherton I petitioners, finding the revised final PEIR failed to adequately address the traffic impacts of narrowing and moving Monterey Highway to accommodate the Pacheco Pass alignment.  It rejected the remaining contentions of the Atherton I petitioners.  The court found it proper to defer analysis of the impacts of the vertical alignment until the second-tier project analysis.  The challenges to the modeling failed; the court found the dispute was a "classic disagreement among experts that often occurs in the CEQA context."

The court disagreed in relevant part with the Atherton II petitioners, finding the alternatives analysis complied with CEQA and there was no abuse of discretion in refusing to consider the Setec alternative.  While the court did reject the Authority's argument that the challenge to the alternatives analysis was barred in its entirety by collateral estoppel, it questioned whether some specific challenges were so barred.

Due to the deficiencies in analysis of the traffic impacts on Monterey Highway, the court denied the motion for discharge of the writ.  The court issued a supplemental peremptory writ ordering the Authority to rescind and set aside the resolution certifying the revised final PEIR (*Atherton II*).

Dissatisfied with only a partial victory, both Atherton I petitioners and Atherton II petitioners (collectively petitioners) appealed.

8

I

*Federal Preemption*

The Authority contends this case must be dismissed because federal law, specifically the Interstate Commerce Commission Termination Act (ICCTA) (49 U.S.C. § 701 et seq.), preempts state environmental law, including CEQA, in this case.[2]

We agree with amicus Citizens for California High-Speed Rail Accountability (CCHRA) that "[p]reemption under ICCTA is a complex, difficult, and controversial subject." We do not find the answer to the question of whether the ICCTA preempts CEQA in this case as certain as the Authority argues. We need not wade into the various complexities and intricacies presented by the broader question of federal preemption, because on the specific record before us it is clear that an exception to preemption, namely the market participation doctrine, applies. Here, it is the sole responsibility of the State to determine the route of the HST, as well as to acquire the necessary property, and construct and operate the HST. Due to the State's proprietary role with respect to the HST, as well as the provisions of Proposition 1A (the voter-approved initiative bond measure to fund the HST) and the Authority's established practice of complying with CEQA, the market participation doctrine applies.

A. *Background*

"Effective January 1, 1996, the ICCTA abolished the Interstate Commerce Commission (ICC) and created a new Surface Transportation Board (STB) to regulate, inter alia, rail transportation in the United States. [Citations.] The purpose of the ICCTA is to 'build[] on the deregulatory policies that have promoted growth and stability in the

---

[2] The Authority argues "on the limited issues before the Court in this appeal, the ICCTA preempts any CEQA remedy." We assume based on this argument that the Authority's preemption claim is limited to the issues presented in this particular case.

surface transportation sector.' [Citation.] With respect to rail transportation, the ICCTA seeks to implement a '[f]ederal scheme of minimal regulation for this intrinsically interstate form of transportation,' and to retain only regulations 'that are necessary to maintain a "safety net" or "backstop" of remedies to address problems of rates, access to facilities, and industry restructuring.' [Citation.]" (*Elam v. Kansas City Southern Railway Co.* (5th Cir. 2011) 635 F.3d 796, 804 (*Elam*).)

In March 2013, the Authority filed with the STB a petition for exemption from the prior approval requirements of 49 United States Code section 10901 to construct an approximately 65-mile dedicated high-speed passenger rail line between Merced and Fresno, California (the first of nine sections of the HST). Concurrently, the Authority filed a motion to dismiss the petition, arguing that the STB lacked jurisdiction because the HST would be located entirely within California, would provide only intrastate transportation, and was not part of an interstate rail network. (*California High-Speed Rail Authority--Construction Exemption--in Merced, Madera and Fresno Counties, Cal.* (STB, Apr. 18, 2013, No. 35724) 2013 STB Lexis 126 at p. *2).) The STB denied the motion to dismiss, finding it had jurisdiction over construction of the HST. (*Id*. at pp. *3- *4.)

In a June 13, 2013, decision, the STB set forth its reasons for finding it had jurisdiction over the HST. "Under 49 U.S.C. § 10501(a)(2)(A), the Board has jurisdiction over transportation by rail carrier between a place in a state and a place in the same state, as long as that intrastate transportation is carried out 'as part of the interstate rail network.' " (*California High-Speed Rail Authority--Construction Exemption--in Merced, Madera and Fresno Counties, Cal. (*STB, June 13, 2013, No. FD 35724) 2013 STB Lexis 180 at p. *24 (*STB June Decision*).) The STB concluded that due to the interconnectivity of the HST system with Amtrak lines, the HST would be constructed as part of the interstate rail network and, therefore, the STB had jurisdiction. (*Ibid*.)

10

In late June 2013, after we had calendared this case for oral argument, the Authority requested from us a continuance of oral argument and permission to file a supplemental brief based on the STB decision we described *ante*. The Authority requested additional time to examine the STB's jurisdictional decision and its potential application to this case. The Authority cited to *City of Auburn v. U.S. Government* (9th Cir. 1998) 154 F.3d 1025 (*City of Auburn*), which broadly held that state and local permitting laws regarding railroad operations were preempted by ICCTA.

Petitioners opposed the request to continue, arguing, inter alia, that the issue of preemption had been waived by the failure to raise it in the trial court.

We granted the continuance and requested supplemental briefing. We asked the parties to brief the answers to two questions: (1) Does federal law preempt state environmental law with respect to California's high-speed rail system? and; (2) Assuming federal law does, in fact, preempt state law in this area, is the preemption in the nature of an affirmative defense that is forfeited if not raised in the trial court or is the preemption jurisdictional in nature?

The Authority's supplemental brief answered that the ICCTA preempted a CEQA remedy in this appeal and the preemption is jurisdictional in nature. Petitioners answered that federal preemption under the ICCTA did not apply to the Authority's compliance with CEQA because CEQA was informational rather than regulatory and because the market participation exception to preemption applied. Petitioners further asserted that because the Authority's compliance with CEQA was not jurisdictionally preempted, any preemptive claim that the project did not have to comply with CEQA was forfeited.[3]

_____

[3] In addition to supplemental briefs from the parties, we granted the requests of several amici curiae to file briefs. We received briefs from the following amici: CCHRA; Preserve Our Heritage (POH); John van de Kamp, San Luis Obispo Coastkeeper, Endangered Habitat League, Environmental Water Caucus, Pacific Energy Policy Center, Laguna Greenbelt, Inc., North County Watch, Communities for Sustainable Monterey

B. *Preemption under the ICCTA*

Under the Supremacy Clause of the United States Constitution, the federal Constitution and federal laws are "the supreme law of the land." (U.S. Const., art. VI, cl. 2.) "The doctrine of preemption gives force to the supremacy clause." (*People v. Burlington Northern Santa Fe Railroad.* (2012) 209 Cal.App.4th 1513, 1521.) "The U.S. Supreme Court has recognized three types of preemption under the supremacy clause: express preemption, conflict preemption, and field preemption. [Citation.]" (*Ibid.*)

The ICCTA contains an express preemption provision; it "creates exclusive federal regulatory jurisdiction and exclusive federal remedies." (*Elam, supra,* 635 F.3d at p. 804.) The STB has jurisdiction over transportation by rail carrier that is within the same state if it is "part of the interstate rail network." (49 U.S.C. § 10501, subd. (a)(1)(A) & (2)(A).) The STB has exclusive jurisdiction over "the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State." (*Id.*, subd. (b)(2).) This subdivision further provides: "the remedies provided under this part [citation] with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law." (*Ibid.*) "It is difficult to imagine a broader statement of Congress's intent to preempt state regulatory authority over railroad operations." (*CSX Transp., Inc. v. Georgia Public Serv. Com'n* (N.D.Ga. 1996) 944 F.Supp. 1573, 1581 (*CSX*).) This provision continues the historic extensive federal regulation of railroads. (*Fayard v. Northeast Vehicle Services, LLC* (1st Cir. 2008) 533 F.3d 42, 46; see *Chicago & N.W. Tr. Co. v. Kalo Brick & Tile* (1981) 450 U.S. 311, 318 [67 L.Ed.2d 258, 265] ["The Interstate

---

County, and West County Toxics Coalition; Union Pacific Railroad Company; and Friends of Eel River, Friends of Rose Canyon, The River Project, Save Our NTC, Inc., and California Native Plant Society. We also received various answers and requests for judicial notice and objections thereto.

Commerce Act is among the most pervasive and comprehensive of federal regulatory schemes."].)

"[A]lthough ICCTA's pre-emption language is unquestionably broad, it does not categorically sweep up all state regulation that touches upon railroads-interference with rail transportation must always be demonstrated." (*Island Park, LLC v. CSX Transp.* (2nd. Cir. 2009) 559 F.3d 96, 104.) "[S]tate actions are 'categorically' or 'facially' preempted where they 'would directly conflict with exclusive federal regulation of railroads.' [Citations.] Courts and the STB have recognized 'two broad categories of state and local actions' that are categorically preempted regardless of the context of the action: (1) 'any form of state or local permitting or preclearance that, by its nature, could be used to deny a railroad the ability to conduct some part of its operations or to proceed with activities that the [STB] has authorized' and (2) 'state or local regulation of matters directly regulated by the [STB]—such as the construction, operation, and abandonment of rail lines; railroad mergers, line acquisitions, and other forms of consolidation; and railroad rates and service.' [Citations.] Because these categories of state regulation are '*per se* unreasonable interference with interstate commerce,' 'the preemption analysis is addressed not to the reasonableness of the particular state or local action, but rather to the act of regulation itself.' [Citations.] Second, those state actions that do not fall into one of these categories may be preempted *as applied*: 'For state or local actions that are not facially preempted, the section 10501(b) preemption analysis requires a factual assessment of whether that action would have the effect of preventing or unreasonably interfering with railroad transportation.' [Citation.]" (*Adrian & Blissfield R. Co. v. Village of Blissfield* (6th Cir. 2008) 550 F.3d 533, 540 (*Adrian*).)

Case law demonstrates that the ICCTA does not preempt all state and local regulations. "The circuits appear generally, for example, to find preemption of environmental regulations, or similar exercises of police powers relating to public health or safety, only when the state regulations are either discriminatory or unduly

burdensome." (*Fayus Enters. v. BNSF Ry.* (D.C. Cir. 2010) 602 F.3d 444, 451 (*Fayus*).) "It therefore appears that states and towns may exercise traditional police powers over the development of railroad property, at least to the extent that the regulations protect public health and safety, are settled and defined, can be obeyed with reasonable certainty, entail no extended or open-ended delays, and can be approved (or rejected) without the exercise of discretion on subjective questions. Electrical, plumbing and fire codes, direct environmental regulations enacted for the protection of the public health and safety, and other generally applicable, non-discriminatory regulations and permit requirements would seem to withstand preemption. [Citation.]" (*Green Mountain R.R. Corp. v. Vermont* (2nd. Cir. 2005) 404 F.3d 638, 643 (*Green Mountain*).)

While the ICCTA's preemption is not limited to explicit economic regulation (*New York Susquehanna v. Jackson* (3rd Cir. 2007) 500 F.3d 238, 252 (*New York Susquehanna*), "Congress was particularly concerned about state *economic* regulation of railroads when it enacted the ICCTA." (*Elam, supra,* 635 F.3d at p. 805.) "What matters is the degree to which the challenged regulation burdens rail transportation, not whether it is styled as 'economic' or 'environmental.' " (*New York Susquehanna, supra,* 500 F.3d at p. 252.)

The Authority may raise the issue of federal preemption for the first time on appeal. The ICCTA "completely preempts state laws (and remedies based on such laws) that directly attempt to manage or govern a railroad's decisions in the economic realm." (*Elam, supra,* 635 F.3d at p. 807.) "[C]omplete preemption is jurisdictional in nature . . . ." (*PCI Transp., Inc. v. Fort Worth & Western R. Co.* (5th Cir. 2005) 418 F.3d 535, 543.) The lack of jurisdiction may be raised for the first time on appeal. (*Consolidated Theatres, Inc. v. Theatrical Stage Employees Union* (1968) 69 Cal.2d 713, 721; *ReadyLink Healthcare, Inc. v. Jones* (2012) 210 Cal.App.4th 1166, 1175 [deciding issue of federal preemption raised for the first time on appeal].)

C.  *The Authority's Contention*

Relying on *City of Auburn, supra,* 154 F.3d 1025, the Authority contends that CEQA is an environmental preclearance statute that is facially preempted by the ICCTA. In *City of Auburn*, a railroad sought to reacquire a segment of the Stampede Pass rail line and to repair and improve it. (*Id.* at pp. 1027-1028.)  Initially, the railroad applied to the local authority for a permit, but later contended that local environmental review was precluded by the federal regulation of railroads.  In response, King County requested and obtained a formal declaratory order from the STB that the ICCTA preempted the County's environmental review.[4] (*Id.* at p. 1028)  The STB approved the railroad's proposal for reacquisition and improvement of the Stampede Pass line. (*Id.* at pp. 1028-1029.)

The City of Auburn challenged the STB decision.  It argued the legislative history of the ICCTA established that Congress intended to preempt only economic regulation, not the traditional state police power of environmental review. (*City of Auburn, supra,* 154 F.3d at p. 1029.)  The Ninth Circuit disagreed; it found no evidence that Congress intended states to have any role in the regulation of railroads. (*Id.* at p. 1031.)  Further, given the broad language of 49 United States Code section 10501, subdivision (b)(2), it found "the distinction between 'economic' and 'environmental' regulation begins to blur. For if local authorities have the ability to impose 'environmental' permitting regulations

---

[4]  The STB, as the agency authorized by Congress to administer the ICCTA, has been called " 'uniquely qualified' " to determine if state law is preempted. (*CSX, supra,* 944 F.Supp. at p. 1584, quoting *Medtronic, Inc. v. Lohr* (1996) 518 U.S. 470, 496 [135 L.Ed.2d 700].)  A request to the STB for a declaratory order of preemption would be the remedy for the Authority's claim of federal preemption, just as it was in *City of Auburn*. The Authority has not informed this court of any request for a formal declaratory order from the STB that the ICCTA preempts CEQA as to the HST system.  In the STB June Decision the STB made no such determination; it did not even mention preemption.  As we discussed *ante*, it merely found it had jurisdiction.

15

on the railroad, such power will in fact amount to 'economic regulation' if the carrier is prevented from constructing, acquiring, operating, abandoning, or discontinuing a line." (*City of Auburn*, at p. 1031.)

In *Green Mountain, supra,* 404 F.3d 638, the railroad proposed to build transloading facilities (to transfer goods from one mode of transportation to another) and sought a declaration that Vermont's environmental land use law, mandating a pre-construction permit for land development, was preempted by the ICCTA. Relying on *City of Auburn*, the Second Circuit found preemption. (*Green Mountain, supra,* 404 F.3d at pp. 642-643.) The court noted that other federal courts and the STB had recognized that the ICCTA preempts most state and local pre-construction permit requirements. (*Id.* at p. 642.)

Under circumstances that differ from those here and involve a private railroad, the STB has found the ICCTA preempts CEQA, relying on *City of Auburn*. In *DesertXpress Enterprises, LLC--Petition for Declaratory Order* (STB, June 27, 2007, No. FD 34914) 2007 STB Lexis 343, the petitioner proposed to construct an approximately 200-mile interstate high-speed passenger rail system between Victorville, California and Las Vegas, Nevada. It sought a declaratory order that federal law preempted state and local land use restrictions, permitting requirements, and environmental laws. (*Id.* at p. *3.) The STB agreed; while federal environmental laws would apply, "state permitting and land use requirements that would apply to non-rail projects, such as [CEQA], will be preempted." (*Id.* at p. *11.)

We do not deem *City of Auburn* to provide the definitive answer to the question of federal preemption in this case. Although *City of Auburn* spoke of "environmental review laws" (*City of Auburn, supra,* 154 F.3d at p. 1027), which would appear to include CEQA, the case concerned only *permitting* laws (*id.* at pp. 1029, 1031), as did *Green Mountain, supra,* 404 F.3d at page 643. The STB decision under review in *City of Auburn* noted it was the permitting "process itself" that was "objectionable." (*Kings*

16

*County, WA--Petition for Declaratory Order--Burlington Northern Railroad Company--Stampede Pass Line* (STB, Sept. 25, 1996, No. FD 32974) 1996 STB Lexis 236 at p. *11.) It is clear that denial of a permit can be " 'used to deny a railroad the ability to conduct some part of its operations or to proceed with activities that the [STB] has authorized,' " and thus the permitting process is preempted. (*Adrian, supra,* 550 F.3d at p. 540) It is less clear and certainly subject to dispute whether requiring review under CEQA before deciding on the alignment of the HST from the Central Valley to the San Francisco Bay Area has a comparable potential effect to deny the railroad the ability to conduct its operations and activities.

In *City of Auburn*, the court was reviewing a decision of the STB that found the permitting laws at issue preempted by the ICCTA. (*City of Auburn, supra,* 154 F.3d at p. 1027.) As we noted *ante*, here the STB June Decision made *no* finding as to preemption, nor was it asked to. Indeed, the STB June Decision, which addressed *only* the portion of the HST between Merced and Fresno (and not the alignment at issue here), did not *mention* preemption. The decision came after extensive state and federal environmental review had been completed, including preparation of an environmental impact study. (*STB June Decision*, *supra*, 2013 STB Lexis 180 at p. *13.) Further, federal cases subsequent to *City of Auburn* have found ICCTA does not preempt all state and local environmental laws, as discussed *ante*. The D.C. Circuit even described *City of Auburn* as "seeming to apply a broader preemption rule." (*Fayus, supra,* 602 F.3d at p. 451.)

We need not, however, wade further into these weeds. Assuming without deciding that the ICCTA preempts CEQA as to the HST, at least one exception to preemption applies here. Their applicability stems from the *nature* of the project at issue here. We are not faced with a private railroad company seeking to construct a rail line without having to comply with state regulations. Rather, it is the State that is constructing the rail line, financed by bonds which were approved by the State's

17

electorate in Proposition 1A.  (Sts. & Hy. Code, § 2704 et seq.)  Proposition 1A, as we discuss *post*, included compliance with CEQA as a feature of the HST.  The State created the Authority to direct development and implementation of the HST.  (Pub. Util. Code, § 185030.)  From at least 2000 until the present, the Authority has complied with CEQA with respect to planning the HST.  It is these factors--state ownership of the HST, Proposition 1A, and years of the Authority's compliance with CEQA--that provide the basis for finding an exception to preemption under the market participation doctrine.  Because we find that doctrine applies, we need not consider the alternate argument, proffered by amicus POH, that state sovereignty defeats preemption.

      D.  *Market Participation Doctrine*

          1.  *In General*

The United States Supreme Court first recognized the market participant doctrine in *Hughes v. Alexandria Scrap Corp*. (1976) 426 U.S. 794 [49 L.Ed.2d 220], upholding a Maryland law that imposed extra documentation requirements on out-of-state processors of scrap metal who sought to receive bounties from the state for converting junk cars into scrap.  "The market participant doctrine distinguishes between a state's role as a regulator, on the one hand, and its role as a market participant, on the other.  Actions taken by a state or its subdivision as a market participant are generally protected from federal preemption."  (*Engine Mfrs. Assn v. SCAQMD* (9th Cir. 2007) 498 F.3d 1031, 1040 (*Engine Mfrs*).)  "[W]hen government agencies are acting in their capacity as the owners of property or purchasers of goods and services, they are not making policy or acting as regulators and largely have the same freedom to protect their interests as do private individuals and entities."  (*Associated General Contractors of America v. San Diego Unified School Dist.* (2011) 195 Cal.App.4th 748, 757.)

The market participation doctrine recognizes considerations of state sovereignty, the state's role "as guardian and trustee for its people," and the right of a private business to exercise discretion as to those with whom it will deal.  (*Reeves, Inc. v. Stake* (1980)

447 U.S. 429, 438 [65 L.Ed.2d 244, 252].)  "Evenhandedness suggests that, when acting as proprietors, States should similarly share existing freedoms from federal constraints, including the inherent limits of the Commerce Clause."  (*Id*. at p. 439 [65 L.Ed.2d at pp. 252-253].)  Analysis in a market participation case involves "a single inquiry: whether the challenged 'program constituted direct state participation in the market.' " (*Id*. at p. 435, fn. 7 [65 L.Ed.2d at p. 250].)

The doctrine has been applied "to protect proprietary state action from preemption by various federal statutes."  (*Engine Mfrs., supra,* 498 F.3d at p. 1040.)  In the preemption context, the market participation exception applies because a state does not regulate when it takes proprietary actions in the market.  (*Building Trades v. Associated Bldrs.* (1993) 507 U.S. 218, 227 [122 L.Ed.2d 565, 576] (*Boston Harbor*).)  "In the absence of any express or implied indication by Congress that a State may not manage its own property when it pursues its purely proprietary interests, and where analogous private conduct would be permitted, this Court will not infer such a restriction. [Citation.]"  (*Id.* at pp. 231-232 [122 L.Ed.2d at p. 579].)

"In distinguishing between proprietary action that is immune from preemption and impermissible attempts to regulate through the spending power, the key under *Boston Harbor* is to focus on two questions.  First, does the challenged action essentially reflect the entity's own interest in its efficient procurement of needed goods and services, as measured by comparison with the typical behavior of private parties in similar circumstances?  Second, does the narrow scope of the challenged action defeat an inference that its primary goal was to encourage a general policy rather than address a specific proprietary problem?  Both questions seek to isolate a class of government interactions with the market that are so narrowly focused, and so in keeping with the ordinary behavior of private parties, that a regulatory impulse can be safely ruled out."  (*Cardinal Towing v. City of Bedford, Texas* (5th Cir. 1999) 180 F.3d 686, 693 (*Cardinal Towing*).)

19

The Ninth Circuit has held this test applies in the alternative. "The *Cardinal Towing* test thus offers two alternative ways to show that a state action constitutes non-regulatory market participation: (1) a state can affirmatively show that its action is proprietary by showing that the challenged conduct reflects its interest in efficiently procuring goods or services, or (2) it can prove a negative--that the action is *not* regulatory--by pointing to the narrow scope of the challenged action. We see no reason to require a state to show both that its action *is* proprietary and that the action is *not* regulatory." (*Johnson v. Rancho Santiago Community College Dist.* (9th Cir. 2010) 623 F.3d 1011, 1024.) We agree that *Cardinal Towing* provides an alternative test; a state action need satisfy only one of the two *Cardinal Towing* prongs to qualify for the market participation exception to preemption.

The market participation doctrine has been applied to defeat preemption where the state's concern was environmental. In *Engine Mfrs., supra*, 498 F.3d 1031, the Ninth Circuit upheld Fleet Rules that directed state and local governments to choose vehicles that met certain emissions standards or contained certain alternative-fuel engines for vehicle fleets against a challenge that such rules were preempted by the federal Clean Air Act. The court rejected the contention that the market participation doctrine did not apply in cases of express preemption, noting that *Boston Harbor* does not support a distinction between express and other kinds of preemption. (*Engine Mfrs., supra,* 498 F.3d at p. 1044.) Further, the court rejected the argument that the rules were not concerned with " 'efficient procurement.' " "That a state or local governmental entity may have policy goals that it seeks to further through its participation in the market does not preclude the doctrine's application, so long as the action in question is the state's own market participation." (*Id.* at p. 1046.) The "efficient procurement" of goods and services is not limited to the cheapest procurement. "In context, 'efficient procurement' means procurement that serves the state's purposes—which may include purposes other

than saving money—just as private entities serve their purposes by taking into account factors other than price in their procurement decisions." (*Ibid.*)

### 2. *Application to this Case*

Petitioners, as well as amici CCHRA and POH, argue the first prong of the *Cardinal Towing* test is met. Undergoing full CEQA review of the decision for the alignment of the Central Valley to Bay Area portion of the HST serves the state's interest in reducing adverse environmental impacts as part of its proprietary action in owning and constructing the HST.

First, the Authority responds broadly that the ICCTA applies to government railroads. (See *California v. Taylor* (1957) 353 U.S. 553 [1 L.Ed.2d 1034] [Federal Railroad Labor Act applies to railroad owned and operated by state and engaged in interstate commerce].) But this is not always the case, as we have discussed. The Authority relies on an unpublished decision where a federal court found the ICCTA preempted a CEQA claim concerning a railroad owned and operated by a governmental entity. (*City of Encinitas v. N. San Diego County Transit Development Bd.* (S.D. Cal. 2002) 2002 U.S. Dist. Lexis 28531.) The City of Encinitas filed an action challenging the proposed construction and operation of a railroad passing track by defendants North San Diego County Transit Development Board, dba North County Transit District, claiming the District failed to comply with CEQA and other state laws. The District had filed a Notice of Exemption from CEQA. (*Id.* at p. *4.) Relying on *City of Auburn*, the court found the action preempted by the ICCTA. (*Id.* at p. *4.) The case is distinguishable from the situation we face here because the railroad owner never accepted that it had to comply with CEQA and the opinion does not discuss the market participation doctrine. " ' "It is axiomatic that cases are not authority for propositions not considered." ' [Citation.]" (*McWilliams v. City of Long Beach* (2013) 56 Cal.4th 613, 626.)

21

Although the Authority notes there is no case applying the market participation doctrine to defeat a claim of preemption under the ICCTA, it does not argue that the doctrine never applies to defeat such preemption.[5]  Indeed, the Authority claims to reserve the power to assert the market participation doctrine in the future, an implicit concession that the doctrine applies.[6]  The Authority asserts the doctrine does not apply in *this case* for other reasons--the most obvious of which is that it has decided not to "assert" it.

The Authority asserts it has not engaged in any proprietary action in complying with CEQA in the preparation of the final revised PEIR at issue here.  "[T]he Authority has not acted in a proprietary capacity to develop its own rules or standards for environmental review of the programmatic route decision or the high-speed train project in general.  In preparing the Program EIR, the Authority was simply complying with a state environmental review statute, CEQA, in good faith until the STB assumed jurisdiction over the project, thereby preempting any further CEQA remedy."

Preliminarily, we take issue with the Authority's view that it was the STB June Decision that preempted CEQA.  We agree with amicus Union Pacific Railroad Company that the basis for preemption is solely the language of the ICCTA, not the discretion of the STB.  (See *Green Mountain, supra,* 404 F.3d at pp. 641-642.)

We turn now to the question of whether the Authority has taken a proprietary action to comply with CEQA, and thus met the first prong of the *Cardinal Towing* test.

---

[5]  We recognize that "[b]ecause the market participant doctrine is not a wholly freestanding doctrine, but rather a presumption about congressional intent, the doctrine may have a different scope under different federal statutes." (*Engine Mfrs., supra,* 498 F.3d at p. 1042.)

[6]  The Authority retreated from this implied concession at oral argument, but did not provide another interpretation for its claim that it reserves the power to assert the market participation exception.

Petitioners (and some amici) contend that the Authority is mandated to comply with CEQA and this was understood by the voters in enacting Proposition 1A, the bond measure that funds the HST. The Authority, as a public entity, is required to comply with CEQA on all projects. (Pub. Resources Code, § 21080.) The Legislature did not exempt the HST from compliance with CEQA. The reasonable inference, therefore, was that the Legislature intended the HST to comply with CEQA and that Proposition 1A was presented to the voters with the expectation that CEQA would apply and the voters ratified the proposition based on this expectation.

This reasonable inference is reinforced by various provisions of Proposition 1A that refer to past and future environmental studies for the HST. In providing for funds to construct the HST, Proposition 1A indicates that construction will be "consistent with the authority's certified environmental impact reports of November 2005 and July 9, 2008." (Sts. & Hy. Code, § 2704.04, subd. (a).) The proceeds from the sale of nine billion dollars of bonds shall be available for planning and capital costs "consistent with the authority's certified environmental impact reports of November 2005 and July 9, 2008, as subsequently modified pursuant to environmental studies conducted by the authority." (*Id.*, § 2704.06.) There is a limitation upon the amount of bond proceeds used for environmental studies. (*Id.*, § 2704.08, subd. (b).) The funding plan must certify that "[t]he authority has completed all necessary project level environmental clearances necessary to proceed to construction." (*Id.*, § 2704.08, subd. (c)(2)(K).)

To further establish the Legislature's intent that the Authority must comply with CEQA, amicus POH requests that this court take judicial notice of a letter from Senator Mark Leno (the Leno Letter) contained in the Senate Daily Journal for the 2011-2012 Regular Session at pages 4447-4448. The Leno Letter is intended to clarify certain matters addressed in Senate Bill No. 1029, which amended the Budget Act of 2012, pertaining to funds for the HST. One provision in Senate Bill No. 1029 contained identical language to that in Proposition 1A (Sts. & Hy. Code, § 2704.08, subd.

(c)(2)(K))--completion of "all necessary project level environmental clearances necessary to proceed to construction." (Stats. 2012, ch. 152, § 3.) The Leno Letter explains, "It is the intent of this provision that no funds appropriated under this item shall be encumbered for construction of a project prior to compliance with CEQA and the National Environmental Policy Act." (Sen. Daily J. (2011-2012 Reg. Sess.) at pp. 4447-4448.)

The Authority opposes this request, claiming the Leno Letter is not relevant.

We grant the request for judicial notice. (Evid. Code, § 452, subd. (c); *Greystone Homes, Inc. v. Midtec, Inc.* (2008) 168 Cal.App.4th 1194, 1222 [taking judicial notice of senator's letter published in Senate Daily Journal].) While the Leno Letter does not address directly the Legislature's intent as to Proposition 1A, as the letter was written four years later with respect to different legislation, it does provide support for the position that the Legislature intended the HST to comply with CEQA. The Leno Letter is evidence of the Legislature's intent as to Senate Bill No. 1029. (*City of Long Beach v. Department of Industrial Relations* (2004) 34 Cal.4th 942, 952.) And the language of Proposition 1A is identical to that in Senate Bill No. 1029. "[U]nless there is evidence the Legislature had a contrary intent, logic and consistency suggest the same language in analogous statutes should be construed the same way." (*Musaelian v. Adams* (2009) 45 Cal.4th 512, 517.)

Yet another factor showing that the Authority would comply with CEQA in building the HST and that the voters so understood when they approved Proposition 1A is the Authority's *longstanding* practice of complying with CEQA in connection with the HST's construction. The Authority admits it has complied with CEQA, preparing and defending EIR's, since 2000. The STB has held that a railroad's voluntary agreement can be enforced notwithstanding the express preemption provision of 49 United States Code section 10501, subdivision (b), because preemption should not be used to shield one from its commitments. " '[V]oluntary agreements must be seen as reflecting the carrier's own

24

determination and admission that the agreements would not unreasonably interfere with interstate commerce.' [Citation.]" (*Joint Petition for Declaratory Order - Boston and Maine Corporation and Town of Ayer, MA. (*STB, Apr. 30, 2001, No. 33971) 2001 STB Lexis 435 at pp. *18-*19.) Although the Authority argues there is no agreement here, a voter approved bond measure is characterized as "either contractual or as analogous to contract." (*Monette-Shaw v. San Francisco Bd. of Supervisors* (2006) 139 Cal.App.4th 1210, 1215.)

As we discussed briefly *ante,* the Authority contends that that it alone can invoke the market participation doctrine as an exception to federal preemption of CEQA. It notes that petitioners and amici cite only cases where the doctrine was used *defensively* by a public entity to protect actions it elected to take in the market. It provides no authority supporting the argument that the power to "invoke" the doctrine is reserved for it to selectively assert in order to exempt those projects of its choosing from federal preemption. This case is unusual to say the least; the state entity, represented by the state's Attorney General, is inexplicably arguing for federal preemption instead of defending the application of state law. We would better understand if the Authority's position was that federal law preempts CEQA and there is nothing the state can do to change that result--like it or not, the law is the law and all must abide by it. The Authority, however, admits the market participation doctrine could apply, apparently if the state chose not to oppose its application, and it "remains free to assert the market participant exception to federal preemption in exercising its proprietary judgment and discretion." The Authority's position appears to be that it alone has discretion to decide whether to require its project, the HST, to comply with CEQA. It argues that forcing it to "take actions that the Authority in its discretion law [*sic*] has elected not to pursue, would turn the market participation doctrine on its head." In making this argument, the Authority ignores that its power is circumscribed by the provisions of Proposition 1A, the voter-approved bond measure to fund the HST. The Authority's discretion is not

25

unfettered; it must follow the directives of the electorate. As explained *ante*, one of those directives is compliance with CEQA.

The Authority offers no direct authority for its proposition that only a state entity can invoke the market participation doctrine. It is clear that citizens have standing to bring suits to enforce CEQA. (See *Rialto Citizens for Responsible Growth v. City of Rialto* (2012) 208 Cal.App.4th 899, 912-916 (*Rialto*).) Here, invoking the market participation doctrine is part of petitioners' challenge to the final revised PEIR.

Finally, the Authority contends the market participation doctrine "is not triggered by the presence of a generally applicable state regulatory law--here CEQA--standing alone." It relies on a series of cases brought against DHL in Florida, New York and California under their respective false claims acts (the *Grupp* cases). In *DHL Express (USA), Inc. v. State ex rel. Grupp* (Fla.App. 2011) 60 So.3d 426 (*Grupp*), the State of Florida contracted with DHL to provide courier services; the contract permitted DHL to impose aviation and diesel fuel surcharges. Grupp and Moll brought suit against DHL under the Florida False Claims Act, contending DHL improperly billed for surcharges. DHL moved to dismiss, contending the action was preempted by federal law. (*Id*. at p. 427.) Grupp and Moll argued their suit did not fall within the preemption provisions of federal law, and if it did, the market participant exception applied. (*Id*. at p. 428.)

The Florida court found preemption under "the sweeping reach in the preemption clauses" of federal law. (*Grupp, supra,* 60 So.3d at p. 428.) Although the court found Florida acted as a market participant in contracting with DHL, "it acts as a regulator in authorizing suits under the False Claims Act which, as noted above, serve to deter future behaviors on the part of the defendants. [Citation.] In the latter role, the state (and respondents' on the state's behalf) is not a market participant." (*Id*. at p. 429.)

The New York Court of Appeals reached the same result in a related case, *State of N.Y. ex rel. Grupp v. DHL Express (USA), Inc.* (2012) 19 N.Y.3d 278. There, Grupp and Moll brought a similar action against DHL under the New York False Claims Act (FCA).

26

(*Id*. at p. 281.)  As in Florida, the court found federal preemption and that the market participation doctrine did not apply.  (*Id*. at pp. 285-286.)  The court explained that although New York acted in a proprietary capacity in procuring the services of DHL, the FCA, with its civil penalties and treble damages, "evinces a broader punitive goal of deterring fraudulent conduct against the State.  That is, instead of compensating the State for damages caused by DHL's purported scheme and addressing its narrow proprietary interests, the FCA would punish and consequently deter such future conduct, thereby promoting a general policy [citations]."  (*Id*. at pp. 286-287.)  For the same reasons, the appellate court agreed that the market participation exception did not apply in its *Grupp* case.  "[T]he State Act's primary goal is the public policy of protecting public funds, and also deterring and punishing fraudulent claims, rather than a specific proprietary concern, such as the need for delivery services."  (*Grupp v. DHL Express (USA), Inc.* (2014) 225 Cal.App.4th 510, 524.)

We find these cases distinguishable.  Preliminarily, we note that in none of the *Grupp* cases did the court rule that only the state could invoke the market participation doctrine.  Further, in this case both the law at issue and the effect of applying the market participation doctrine are different than in the *Grupp* cases.  Unlike the false claims acts at issue in the *Grupp* cases, CEQA has no provision for civil penalties or treble damages; CEQA has no intent to punish and deter wrongdoing.  The purpose of CEQA is "to protect and maintain California's environmental quality."  (*Communities for a Better Environment v. California Resources Agency* (2002) 103 Cal.App.4th 98, 106.)  While the plaintiffs in the *Grupp* cases sought to regulate the behavior of a third party, DHL, the remedy sought here would apply *only* to this final revised PEIR.  Here, application of the market participation doctrine will serve to regulate only the state's own behavior, and such regulation was agreed to by the state and required by Proposition 1A.

27

E. *Requests for Judicial Notice*

In addition to the request by amicus POH for judicial notice of the Leno Letter, which we grant as explained *ante*, we have received other requests for judicial notice. Petitioners request we take judicial notice of the corporate code of conduct of Google, Inc., an article on corporate initiative on environmental and social issues, the testimony of the STB chair on reauthorization of the STB, and that the Authority is within the State Tranportation Agency. The Authority requests that we take judicial notice of the fact that amicus POH participated in the STB proceedings and of letters POH submitted asking the STB to exercise jurisdiction over the HST. We deny the requests as these matters are irrelevant. (*People v. McKinzie* (2012) 54 Cal.4th 1302, 1326 [court will take judicial notice of only relevant matters].)

Having determined that an exception to preemption, namely the market participation doctrine, applies such that federal law does not preempt petitioners' claims in this case, we proceed to address those claims on their merits.

II

*Failure to Discuss Impacts of Elevated Vertical Alignment*

Petitioners contend the revised final PEIR was inadequate because it failed to identify significant new or increased impacts due to the elevated vertical alignment of the HST through a portion of the Peninsula.

A. *Background*

The Authority explained that the revised final PEIR was a first-tier program EIR/EIS, focusing on the broad policy choices ripe for decision: which network alternative and alignment alternatives should connect the Bay Area to the Central Valley and which station location options should be chosen. "The focus of the analysis is the programmatic environmental impacts associated with different network alternatives to connect the Bay Area to the Central Valley for the HST system. The network alternatives and station location options are defined conceptually, and the level of detail for impacts

28

analysis and mitigation strategies is commensurately broad and general." A second-tier EIR would provide more detailed, site-specific impacts analyses. Accordingly, the PEIR contained only a general discussion of the project's impacts relating to aesthetics and visual resources and noise and vibration.

One comment to the revised draft PEIR had been that the alignment of the HST through the Peninsula was likely to be by means of aerial viaducts or raised berms and elevated trains posed problems in residential neighborhoods. The Authority responded: "The Bay Area to Central Valley High-Speed Train HST Program environmental process did not select a vertical alignment. However, the precise alignment and profile options for the HST system in the Caltrain Corridor will be evaluated and refined as a part of the project-level preliminary engineering and environmental review if this corridor moves forward."

Because the trial court denied the Atherton I petitioners' request for a stay of project-level environmental studies, the Authority continued analysis at the project level while the revised final PEIR was being prepared. A June 2010 preliminary alternatives analysis report indicated that various alternative vertical alignments--such as aerial viaduct, berm, at grade, covered trench/tunnel, and deep tunnel--were carried forward for additional study and analysis.

In August 2010, a month before the September 2010 certification of the revised final PEIR, the Authority issued a Supplemental Alternatives Analysis Report (SAAR) as part of its project-level analysis. The SAAR concluded that an elevated structure, or aerial viaduct, was the only feasible alignment for the Belmont-San Carlos-Redwood City portion of the HST route.[7] This portion of the route was designated as subsections 4B(2)

---

[7] Redwood City supported the Pacheco Pass alignment alternative.

and 4C in the SAAR. For these subsections, only the aerial viaduct was carried forward for further analysis.

For subsection 4B(2), the SAAR found a deep tunnel impractical due to ground conditions, construction issues, and costs. A covered trench and tunnel required a greater right-of-way than an aerial structure and required addressing significant ventilation and safety issues. For the 4C portion through Redwood City, the profile had been developed to satisfy the city's request that Whipple Road remain at its existing elevation. A short trench section might be possible in downtown if the Whipple Road elevation were modified.

The trial court rejected petitioners' argument that the Authority was required to address the impact of the *project-level* decision for aerial viaducts in the *program-level* EIR. The court found the Authority properly used tiering in its analysis of the project. Under the tiering scheme, the Authority could properly defer analysis of site-specific details, such as the aerial viaduct vertical alignment, to the second-tier, project-level analysis.

On appeal, petitioners contend tiering is appropriate only when the impacts are not determined by the first-tier approval decision. They assert that the SAAR eliminated all possible vertical alignments for the Belmont-San Carlos-Redwood City corridor except one, the aerial viaduct. They contend the SAAR showed that the decision to use the Pacheco Pass route mandated the use of aerial viaducts in these areas. Thus, the elevated alignment was a foreseeable part of the future project and should have been discussed in the PEIR, and not deferred to the project-level analysis.

B. *Program EIRs and Tiering*

The EIR at issue here is a program EIR. A program EIR is "an EIR which may be prepared on a series of actions that can be characterized as one large project" and are

related in specified ways. (Cal. Code Regs., tit. 14, § 15168, subd. (a).)[8] Program EIRs offer several advantages. A program EIR can: "(1) Provide an occasion for a more exhaustive consideration of effects and alternatives than would be practical in an EIR on an individual action, [¶] (2) Ensure consideration of cumulative impacts that might be slighted in a case-by-case analysis, [¶] (3) Avoid duplicative reconsideration of basic policy considerations, [¶] (4) Allow the lead agency to consider broad policy alternatives and program wide mitigation measures at an early time when the agency has greater flexibility to deal with basic problems or cumulative impacts, [and] [¶] (5) Allow reduction in paperwork." (CEQA Guidelines, § 15168, subd. (b).) A program EIR is distinct from a project EIR, which is prepared for a specific project and must examine in detail site-specific considerations. (CEQA Guidelines, § 15161.)

"Program EIR's are commonly used in conjunction with the process of tiering. [Citation.] Tiering is 'the coverage of general matters in broader EIRs (such as on general plans or policy statements) with subsequent narrower EIRs . . . .' ([CEQA Guidelines,] § 15385.) Tiering is proper 'when it helps a public agency to focus upon the issues ripe for decision at each level of environmental review and in order to exclude duplicative analysis of environmental effects examined in previous environmental impact reports.' [Citations.]

"In addressing the appropriate amount of detail required at different stages in the tiering process, the CEQA Guidelines state that '[w]here a lead agency is using the tiering process in connection with an EIR for a large-scale planning approval, such as a general plan or component thereof . . . , the development of detailed, site-specific information may not be feasible but can be deferred, in many instances, until such time as the lead agency prepares a future environmental document in connection with a project of

---

[8] California Code of Regulations, title 14, section 15000 et seq. are hereafter referred to as CEQA Guidelines.

a more limited geographic scale, as long as deferral does not prevent adequate identification of significant effects of the planning approval at hand.' ([CEQA Guidelines] § 15152, subd. (c).) This court has explained that '[t]iering is properly used to defer analysis of environmental impacts and mitigation measures to later phases when the impacts or mitigation measures are not determined by the first-tier approval decision but are specific to the later phases.' [Citation.]" (*In re Bay-Delta etc.* (2008) 43 Cal.4th 1143, 1170 (*Bay-Delta*).)

At issue in *Bay-Delta* was the adequacy under CEQA of a program EIR/EIS (PEIS/R) for a comprehensive plan, the CALFED Program, to restore the ecological health and improve the management of Bay-Delta water. (*Bay-Delta, supra,* 43 Cal.4th at p. 1151.) One of the challenges was that it lacked sufficient detail regarding the sources of water to implement the CALFED Program. The high court held the PEIS/R was sufficient and it did not need to identify more specifically the potential water sources and analyze the impacts of supplying water from each source. (*Id.* at p. 1169.) It was a program EIR used in conjunction with tiering and consistent with its function as a first-tier document it identified potential sources of water and discussed the impacts of taking water from these sources in general terms. (*Id.* at pp. 1170-1171.) The court noted that the CALFED Program was to be implemented over a 30-year period and therefore it was "impracticable to foresee with certainty specific sources of water and their impacts." (*Id.* at p. 1172.)

Another issue in *Bay-Delta* was whether the PEIS/R failed to include details about a second-tier project, the Environmental Water Account or EWA, contained in the Action Framework, released shortly before certification of the PEIS/R. The Action Framework specified two actual sources of water for the EWA. (*Bay-Delta, supra,* 43 Cal.4th at p. 1174.) The high court held the specific EWA details in the Action Framework need not have been included in the PEIS/R. "The PEIS/R contained a level of detail appropriate to its first-tier, programmatic nature." (*Id.* at p. 1176.)

In reaching its conclusion, the *Bay-Delta* court relied on the analysis in *Al Larson Boat Shop, Inc. v. Board of Harbor Commissioners* (1993) 18 Cal.App.4th 729 (*Al Larson*). As described by *Bay-Delta*, "At issue in *Al Larson* was the propriety of deferring analysis to future project EIR's for a city's port development plan. [Citation.] The plan proposed the use of six anticipated projects to develop the port to meet increased demand for commercial cargo handling. [Citation.] The Long Beach Board of Harbor Commissioners chose, however, to defer approval on specific sites for those six projects to second-tier project EIR's, two of which were considered nearly concurrently with the final first-tier EIR. [Citation.]" (*Bay-Delta, supra,* 43 Cal.4th at p. 1176.) The *Al Larson* court found this deferral appropriate. "The concept of tiering supports allowing the agency and the public to first decide whether it is a good idea to increase Port capacity in a given five-year period at all, or by means of the six 'anticipated projects.' If that decision is made in the affirmative then each individual project can be reviewed in-depth on its merits in a project EIR with no weight claimed for any supposed 'approval' of the individual project or 'planning' of its location." (*Al Larson*, *supra*, 18 Cal.App.4th at p. 744.)

The *Bay-Delta* court found the CALFED Program at least as broad in scope as the port development plan in *Al Larson*. (*Bay-Delta, supra,* 43 Cal.4th at p. 1176.) "CALFED worked out some of the EWA details while it was completing the final PEIS/R, and it properly released those details in the second-tier Action Framework in June 2000, one month before it released the final PEIS/R. The Action Framework set out *specific* details regarding the EWA project components whose general impacts were analyzed in the PEIS/R. . . . These second-tier project details were not, as the Court of Appeal asserted, 'significant information' that should have been included in the first-tier, final PEIS/R. The PEIS/R therefore complied with CEQA in analyzing the impacts of the EWA in general terms and deferring project-level details to subsequent project-level EIR's." (*Id*. at p. 1177.)

C. *Analysis*

Here, we conclude the revised final PEIR/EIS properly deferred detailed analysis of the impacts of the vertical alignment in the Belmont-San Carlos-Redwood City area to the second-tier project EIR. The precise vertical alignment of the HST at specific locations is the type of site specific consideration that must be examined in detail in a project EIR. (CEQA Guidelines, § 15161.) The need for an aerial viaduct in the Belmont-San Carlos-Redwood City portion of the route, as identified in the SAAR, is analogous to the identification of two specific water sources for the CALFED Program in the Action Framework in *Bay-Delta*. The specific identity of the sources of water in *Bay-Delta*, like the specific need for an aerial viaduct here, was not a foreseeable significant impact of the planning approval at hand. (CEQA Guidelines, § 15152(c).) Instead, the need for aerial viaducts at certain locations was not determined until project-level analysis was performed, just as the two specific water sources in *Bay-Delta* were not determined until the project-level analysis of the EWA. That such project-level analysis occurred before the final program EIR was certified did not require in *Bay-Delta*, and does not require here, inclusion of the analysis in the program EIR.

Postponing analysis of the aerial viaducts at Belmont-San Carlos-Redwood City was appropriate under tiering, just as was delaying approval of the six individual projects in *Al Larson*. The purpose of tiering is "to focus upon the issues ripe for decision at each level of environmental review." (Pub. Resources Code, § 21093, subd. (a).) The *Al Larson* court did not require approval of the six "anticipated" projects in the first-tier program EIR, even though project EIRs for those projects were concurrently developed and two were approved. (*Al Larson, supra,* 18 Cal.App.4th at p. 737.) Here, there was no approval for the aerial viaducts because the primary decisions ripe for review in the first-tier program EIR were the general alignment and choice of routes between the Pacheco Pass and the Altamont Pass, and did not include the specific vertical alignment at a certain portion of the HST's route.

Policy considerations also militate against requiring the level of detail petitioners seek in a program EIR. Requiring a first-tier program EIR to provide greater detail as revealed by project-level analyses, "undermine[s] the purpose of tiering and burden[s] the program EIR with detail that would be more feasibly given and more useful at the second tier stage." (*Bay-Delta, supra,* 43 Cal.4th at p. 1173.) While significant new information must be included in an EIR, requiring a program EIR to include everything discovered in project-level analyses before the program EIR is certified would result in "endless rounds of revision and recirculation" of EIRs that the Legislature did not intend. (*Laurel Heights Improvement Assn. v. Regents of University of California* (1993) 6 Cal.4th 1112, 1132.) Petitioners' position would require an agency to stop all project-level analysis until after the program EIR was certified in order to avoid endless revisions. While petitioners may *desire* this result, they offer no authority that demonstrates the law requires it.

Petitioners claim the analogous case is not *Bay-Delta*, but *City of Antioch v. City Council* (1986) 187 Cal.App.3d 1325 (*Antioch*). In *Antioch*, the city council of Pittsburgh prepared a negative declaration rather than an EIR for a proposed road and sewer construction project, contending a negative declaration was appropriate because at this stage the proposed roadway would not connect to any existing streets. (*Id.* at p. 1333.) The appellate court found an EIR was required. (*Id.* at pp. 1337-1338.) The project could not be considered in isolation; since the project was to serve as a catalyst for future development, an EIR was necessary "to evaluate only the forms and extent of future development that now reasonably seem most likely to result from the roadway and utility projects." (*Id.* at p. 1338.)

We find *Antioch* inapposite because it did not involve a program EIR or the use of tiering. As we have explained, the revised final PEIR at issue here properly deferred analysis of environmental impacts and mitigation measures for the vertical alignments at certain portions of the HST system's route to later project EIRs because such " 'impacts

35

or mitigation measures are not determined by the first-tier approval decision but are specific to the later phases.' [Citation.]" (*Bay-Delta, supra,* 43 Cal.4th 1143, 1170.)

III

*Adequacy of Ridership Model*

Petitioners contend the ridership model used for the description of the project was so inadequate and flawed that it prevented meaningful comments. Specifically, petitioners contend the modeling increased the service headway coefficient (which indicates frequency of service) and there was no substantial evidence to support this decision.

A. *Background*

A ridership model is a complex set of mathematical equations used to predict how people will travel. The equations use both constants and coefficients that describe the importance of each input variable in a traveler's decisions. One of the coefficients is for service headway. Cambridge Systematics (Cambridge) prepared the modeling used in the revised final program EIR and some of the constants and coefficients were revised from those first used. The coefficient for service headway was increased by a factor of five from that originally used; this change increased the importance of frequent service.[9] Petitioners contend this change unfairly favored the Pacheco Pass alternative.

At the request of the Senate Transportation and Housing Committee, the Authority contracted with the Institute of Transportation Studies at the University of California, Berkeley (ITS) to prepare a peer review of the ridership and revenue model developed by Cambridge. ITS concluded that Cambridge "has followed generally accepted professional standards in carrying out the demand modeling and analysis. Nevertheless we have found some significant problems that render the key demand forecasting models

---

[9] Recall that the Pacheco Pass route provided for more frequent service to San Jose and San Francisco without additional trains. (See *ante*.)

36

unreliable for policy analysis."[10]  ITS identified a problem with changing the service

headway coefficient; ITS found fault because the change was based on experience with

*intra*-regional demand models and the HST system provided *inter*-regional travel service.

ITS noted that Cambridge changed key parameter values "because the resulting estimates

did not accord with the modelers' a priori expectations."  ITS noted that while this kind

of adjustment was frequently done in this type of work, the a priori expectations must be

based on experience with like contexts.  ITS concluded that while the model provided

reasonably accurate " 'backcasts' " for 2000, reflected certain patterns of behavior

observed in traveler surveys, and was in accord with the professional judgment of the

consultant, the combination of problems meant the model would have very large "error

bounds" in its forecasts of high-speed rail demand.  These "error bounds" could

significantly misstate the profitability of the HST system.

In response to the ITS report, Cambridge asserted that coefficients were

constrained (adjusted) to replicate existing travel patterns.  The service headway

coefficient was adjusted to comport with observed base year data.  Cambridge reported

that the various coefficients used "reflect observed current experiences and proposed

service levels."  The coefficient for service headway was constrained to reflect the unique

situation that high-speed trains offer far more frequent inter-regional service than current

conventional rail services such as Amtrak.  When faced with conflicting data, Cambridge

asserted that modelers must use their professional judgment.  The service headway

coefficient was constrained "to better replicate existing travel patterns and create a policy

sensitive model."

Both Cambridge and ITS made presentations to the Authority's board concerning

the ITS report and Cambridge's response.  There was also public comment.  Two

---

**10**  On appeal, petitioners challenge only the headway coefficient.  We confine our
discussion to that issue.

agencies with extensive travel model experience supported Cambridge's model. The Authority recognized the "very strong differences in professional opinion" between Cambridge and ITS. The Authority believed ITS's opinion was focused primarily on the state of practice in travel modeling, not on Cambridge's work or model. The Authority found the difference of opinions between Cambridge and ITS "frames a classic disagreement between the academician and the industry practitioner. In the Authority's view, the professional opinions of the industry practitioner carry more weight in this 'real world' context."

In rejecting petitioners' challenge to the ridership model, the trial court found it was an "inevitable CEQA 'battle of the experts.' "

B. *The Law*

"We apply the substantial evidence test to conclusions, findings, and determinations, and to challenges to the scope of an EIR's analysis of a topic, the methodology used for studying an impact, and the reliability or accuracy of the data upon which the EIR relied because these types of challenges involve factual questions." (*City of Long Beach v. Los Angeles Unified School Dist.* (2009) 176 Cal.App.4th 889, 898.) CEQA defines substantial evidence as "enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached." (CEQA Guidelines, § 15384, subd. (a); *San Joaquin Raptor/Wildlife Rescue Center v. County of Stanislaus* (1994) 27 Cal.App.4th 713, 722.)

"Disagreement among experts does not make an EIR inadequate, but the EIR should summarize the main points of disagreement among the experts. The courts have looked not for perfection but for adequacy, completeness, and a good faith effort at full disclosure." (CEQA Guidelines, § 15151.) "When the evidence on an issue conflicts, the decisionmaker is 'permitted to give more weight to some of the evidence and to favor the

opinions and estimates of some of the experts over the others.' [Citation.]" (*Association of Irritated Residents v. County of Madera* (2003) 107 Cal.App.4th 1383, 1397.)

"When a challenge is brought to studies on which an EIR is based, 'the issue is not whether the studies are irrefutable or whether they could have been better. The relevant issue is only whether the studies are sufficiently credible to be considered *as part of* the total evidence that supports the' agency's decision. [Citation.] 'A clearly inadequate or unsupported study is entitled to no judicial deference.' [Citation.] The party challenging the EIR, however, bears the burden of demonstrating that the studies on which the EIR is based 'are clearly inadequate or unsupported.' [Citation.]" (*State Water Resources Control Bd. Cases* (2006) 136 Cal.App.4th 674, 795.)

"[O]ur Supreme Court has cautioned reviewing courts against performing our own scientific critiques of environmental studies, a task for which we have neither resources nor scientific expertise. [Citation.]" (*Eureka Citizens for Responsible Government v. City of Eureka* (2007) 147 Cal.App.4th 357, 372 (*Eureka*).)

C. *Analysis*

Petitioners contend no evidence supports the change to the service headway coefficient, only Cambridge's "professional judgment." They argue that such professional judgment is inadequate unless supported by facts. We find sufficient evidence supports the change to the service headway coefficient.

Cambridge explained that it changed the service headway coefficient to comply with observed data from travel surveys. Cambridge set forth that the decision of which data to use--*intra*-regional or *inter*-regional--was a matter of professional judgment. ITS conceded Cambridge's model was accurate for the 2000 base year and conformed to observations from the travel surveys. The disagreement was whether to use a service headway coefficient often used for *intra*-regional travel when the HST system provided *inter*-regional travel. Cambridge explained its choice; the HST system provided more frequent service than conventional inter-regional rail service. We find this difference of

opinion as to which coefficient to use, and on which data to base it, is a dispute between experts that does not render an EIR inadequate. (CEQA Guidelines, § 15151.)

Petitioners have failed to carry their burden to show Cambridge's travel model is " 'clearly inadequate or unsupported.' [Citation]" (*State Water Resources Control Bd. Cases, supra,* 136 Cal.App.4th at p. 795.) They make no attempt to challenge the expert qualifications of Cambridge. (*Save Round Valley Alliance v. County of Inyo* (2007) 157 Cal.App.4th 1437, 1468.) ITS agreed that Cambridge had followed generally accepted professional standards. Further, two other experts supported Cambridge's travel model. Petitioners challenge the credibility of these other experts, noting their letters of support "were recruited" by Cambridge and both entities had ties to Cambridge. It is well established that in performing a substantial evidence review, we do not resolve issues of credibility. (*Simons v. City of Los Angeles* (1976) 63 Cal.App.3d 455, 470.) "[I]f there are conflicts in the evidence, their resolution is for the agency." (*Sierra Club v. County of Sonoma* (1992) 6 Cal.App.4th 1307, 1317.)

Petitioners contend the recent case *Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747 (*Sargon*), supports their contention. In *Sargon*, our Supreme Court held the trial court properly fulfilled its duty as a gatekeeper to exclude speculative expert testimony on lost profits. (*Id*. at p. 753.) The high court stated that "under Evidence Code sections 801, subdivision (b), and 802, the trial court acts as a gatekeeper to exclude expert opinion testimony that is (1) based on matter of a type on which an expert may not reasonably rely, (2) based on reasons unsupported by the material on which the expert relies, or (3) speculative." (*Id*. at pp. 771-772.) "In short, the gatekeeper's role 'is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.' [Citation.]" (*Id.* at p. 772.)

As set forth *ante,* petitioners have not established that Cambridge's modeling failed this test for proper expert evidence.  ITS agreed that Cambridge had followed generally accepted professional standards.  We find more useful another point made by our Supreme Court in *Sargon.*  "The trial court's gatekeeping role does not involve choosing between competing expert opinions.  The [United States Supreme Court] warned that the gatekeeper's focus 'must be solely on principles and methodology, not on the conclusions that they generate.'  [Citation.]"  (*Sargon, supra,* 55 Cal.4th at p. 772.)

Substantial evidence supports the use of the Cambridge travel model.

IV

*Consideration of Setec Alternatives*

In *Atherton I,* the trial court ordered the Authority to revise the EIR to include Union Pacific Railroad's opposition to allowing the use of its right-of-way at any point in the proposed alignment.  Petitioners contend the inability to use the Union Pacific Railroad right-of-way was a changed circumstance that required the Authority to reopen its consideration of alternatives.  Specifically, they contend the revised final PEIR violated CEQA by failing to consider the alternative alignments for an Altamont Pass route proposed by Setec.  They contend substantial evidence does not support the determination that these alternatives were either infeasible or substantially the same as those already considered.

A.  *Background*

The *Atherton I* petition challenged the final PEIR's discussion of alternatives.  The trial court rejected this challenge, finding the final PEIR "studied a reasonable range of alternatives and presented a fair and unbiased analysis."  The court noted that 21 representative network alternatives were summarized and compared.  The court further found substantial evidence supported rejecting certain alternatives as infeasible, including directing the HST system over the existing, out-of-service Dumbarton rail bridge, using train-splitting, and using the U.S. Highway 101 median through the Peninsula.

41

In support of using the Altamont Pass, the Altamont Advocates presented a proposal prepared by Setec. Setec concluded that the Altamont Pass provided a better route than the Pacheco Pass. Setec provided a discussion of the various components of the Altamont Pass route and proposed using train-splitting.[11]

The consultant Parsons Brinckerhoff prepared an assessment of the Setec proposal for the Authority. This assessment stated that the Setec alternative shared many of the characteristics with the alternatives previously studied and made certain trade-offs that did not offer any significant benefit. The assessment concluded: "Given that the tangible differences between the Altamont alignments studied in the 2008 Final Program EIR and the Setec Alternative are small, we do not believe the Setec Alternative alters the basic comparison between Altamont Pass and Pacheco Pass network alternatives that serve both San Francisco and San Jose. We do not believe the Setec Alternative merits further consideration." The Authority adopted this position.

The trial court rejected the Authority's contention that the entire challenge to the alternatives analysis was barred by collateral estoppel, but questioned whether certain specific challenges were so barred, such as train-splitting and the use of the Dumbarton rail bridge. The court found that the Authority's rejection of the Setec alternative was supported by substantial evidence.

B. *Discussion of Alternatives under CEQA*

"The core of an EIR is the mitigation and alternatives sections. The Legislature has declared it the policy of the State to 'consider alternatives to proposed actions

---

[11] Train-splitting refers to physically separating a trainset so that one trainset can serve more than one terminus. Setec described train-splitting as follows: "A typical European high-speed train is made up of two independently operable segments, each with control cabs at each end [a trainset]. Coupled together for most of the journey, they can be driven by a single operator. A second operator added at a junction allows the coupled sets to divide to serve different origins or destinations."

affecting the environment.'  [Citations.]  Section 21002.1, subdivision (a) of the Public Resources Code provides:  'The purpose of an environmental impact report is to identify the significant effects of a project on the environment, *to identify alternatives to the project*, and to indicate the manner in which those significant effects can be mitigated or avoided.'  [Citation.]"  (*Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 564-565.)

"When an EIR discusses a reasonable range of alternatives sufficient to foster informed decisionmaking, it is not required to discuss additional alternatives substantially similar to those discussed.  [Citation.]  The selection of alternatives discussed 'will be upheld, unless the challenger demonstrates "that the alternatives are manifestly unreasonable and that they do not contribute to a reasonable range of alternatives." [Citation.]' "  (*Cherry Valley Pass Acres & Neighbors v. City of Beaumont* (2010) 190 Cal.App.4th 316, 355 (*Cherry Valley*).)

"The entire purpose of the alternatives section in an EIR is to consider environmentally superior alternatives that would 'accomplish most of the project objectives.' "  (*The Flanders Foundation v. City of Carmel-by-the-Sea* (2012) 202 Cal.App.4th 603, 623.)  "[A] lead agency may reject an alternative as infeasible because it cannot meet project objectives, as long as the finding is supported by substantial evidence in the record.  [Citation.]"  (*Rialto, supra,* 208 Cal.App.4th at p. 949.)  CEQA defines " '[f]easible' " as "capable of being accomplished in a successful manner within a reasonable period of time, taking into account economic, environmental, social, and technological factors."  (Pub. Resources Code, § 21061.1.)  In determining whether changes to a project are feasible, a public agency shall consider economic, social, technological, environmental, and other factors.  (CEQA Guidelines, § 15131(c).)

Absent legal error, the City's infeasibility findings are entitled to great deference and are presumed correct.  (*California Native Plant Society v. City of Santa Cruz* (2009) 177 Cal.App.4th 957, 997.)  "The parties seeking mandamus bear the burden of proving

otherwise, and the reviewing court must resolve reasonable doubts in favor of the administrative findings and determination." (*Sierra Club v. County of Napa* (2004) 121 Cal.App.4th 1490, 1497.)

A supplemental EIR is required when new information shows an alternative previously found not feasible would be feasible or an alternative considerably different from those previously analyzed would substantially reduce one or more significant effects on the environment but the project proponents decline to adopt it. (CEQA Guidelines, § 15162(a)(3)(C) & (D).)

C. *Rejection of Train-Splitting*

The Authority's rejection of Setec's Altamont Pass alternative was based in part on its earlier rejection of train-splitting. Setec suggested two patterns of train-splitting: a Central Valley split at Modesto or Tracy and a Bay Area split at Redwood City or Fremont. Setec concluded the use of train-splitting would result in savings of both travel time and costs.[12]

The Authority contends Petitioners' challenge to the rejection of train-splitting is barred by collateral estoppel because the issue was decided in favor of the Authority in *Atherton I*.[13] We agree. "Collateral estoppel precludes relitigation of issues argued and

---

[12] Relying on the Parsons Brinckerhoff assessment and citing differences in international models, the Authority responded that the time required for splitting and coupling trains could be longer than the times cited in the Setec proposal. The Authority also noted that train-splitting was not a determinative factor in selecting a route. "[W]e note that it is unlikely that the application of splitting and joining trains would benefit one alignment alternative over another."

[13] Petitioners contend the Authority is precluded from relying on collateral estoppel because it did not cross-appeal. We disagree. Nothing in the trial court's judgment precludes applying collateral estoppel to the train-splitting issue; the court made no factual findings that would prevent application of collateral estoppel to this issue. The court found *only* that collateral estoppel did not bar petitioners' *entire* challenge to the alternatives. Indeed, the trial court questioned whether collateral estoppel might apply to

44

decided in prior proceedings. [Citation.] Traditionally, we have applied the doctrine only if several threshold requirements are fulfilled. First, the issue sought to be precluded from relitigation must be identical to that decided in a former proceeding. Second, this issue must have been actually litigated in the former proceeding. Third, it must have been necessarily decided in the former proceeding. Fourth, the decision in the former proceeding must be final and on the merits. Finally, the party against whom preclusion is sought must be the same as, or in privity with, the party to the former proceeding. [Citations.]" (*Lucido v. Superior Court* (1990) 51 Cal.3d 335, 341, fn. omitted.)

Petitioners challenge only the first requirement, the identical nature of the issues. Petitioners contend the issue of train-splitting is not identical to that decided in *Atherton I* because there the alignment at issue used the Union Pacific Railroad right-of-way, and here the revised final PEIR considers an alignment that does not use that right-of-way. Petitioners fail, however, to show how the loss of the railroad right-of-way affects the issue of train-splitting. Nothing in the discussion of train-splitting was dependent on the use or non-use of the railroad right-of-way.

Moreover, we agree with the trial court that petitioners have failed to refute the contention that the disagreement about the merits and feasibility of train-splitting is simply the type of disagreement among experts that is not unusual and does not make an EIR inadequate. (*Eureka, supra,* 147 Cal.App.4th at p. 371.)

D. *Dumbarton Rail Bridge*

The final PEIR studied three alternatives for the Dumbarton crossing: a high bridge, a low bridge, and a tube. Any Dumbarton crossing had significant potential impacts. HST service across the Bay "would likely result in significant impacts on San Francisco Bay, Don Edwards San Francisco Bay National Wildlife Refuge (Refuge),

the issue of train-splitting. That the trial court did not rely on collateral estoppel is of no moment. "In reviewing a trial court's decision, we review the result, not the reasoning." (*Florio v. Lau* (1998) 68 Cal.App.4th 637, 653.)

aquatic resources, and sensitive plant and wildlife species." The Pacheco Pass alternative would not require a bay crossing or affect the Refuge, and "would result in fewer impacts on wetlands and aquatic resources than the Altamont Pass network alternatives. . . . The magnitude of impacts on biological resources of the Bay crossing would be greater than the impacts along the Pacheco alignment." The HST system was not compatible with Dumbarton rail service technology and would require more tracks, and a high bridge would have larger potential impacts and a higher cost. Further, several members of the United States Congress and the California Legislature commented that any alternative requiring construction through the Don Edwards Refuge should be rejected and the City of Fremont opposed any Dumbarton alternative because of its potential impact on Fremont neighborhoods.

The Setec proposal included crossing the bay over a (yet unbuilt) Dumbarton rail bridge. Recognizing the existing rail bridge, which was not in use, would need to be rebuilt to accommodate the HST system, Setec proposed two alternatives: a lift-span or drawbridge or a high central pier structure (like the adjacent Dumbarton highway bridge) and recommended the latter. "From a European perspective, it seems inconceivable that such a simple and short bridge would be considered a financial or technical hurdle." Setec proposed using the same alignment as the current rail bridge, and recognized the potentially significant impacts to wildlife during construction. It suggested it might be possible to reduce these impacts by working from the existing bridge structure, and scheduling construction to avoid breeding and nesting periods for the area's wildlife. Further, replacing existing rail embankments with cap and beam construction would improve the existing wetlands environment.

The Parsons Brinckerhoff assessment noted, "The 2008 Program EIR evaluated both a high and low bridge crossing at Dumbarton, and therefore, this component of the Setec Alternative is similar to the portions of the various Altamont Pass alignment alternatives." Again, the Authority adopted this view. The Authority further noted the

problems with the proposed Dumbarton rail bridge due to the presence of endangered species in the same area. The Setec proposal did not mention that the Refuge was home to at least three endangered species, and there would be heavy restrictions on construction due to the need to adequately preserve their habitat throughout. The issue was not limited to the type of bridge; regardless of the type selected, much of its construction would occur inside the Refuge and would have potential impacts on 15 special-status plant and 21 special-status wildlife species.

"When an EIR discusses a reasonable range of alternatives sufficient to foster informed decisionmaking, it is not required to discuss additional alternatives substantially similar to those discussed. [Citation .]" (*Cherry Valley, supra,* 190 Cal.App.4th at p. 355.) Petitioners have failed to show the Dumbarton rail bridge proposed by Setec is not substantially similar to the Dumbarton high bridge alternative already discussed in the final PEIR.[14] Although Petitioners contend Setec offered additional information, both about the bridge and how to mitigate potential impacts, we are not persuaded. The final PEIR identified significant environmental impacts posed by a Bay crossing. The Setec proposal offered only some *possible* mitigation measures and it failed to address the concerns about endangered and threatened species and construction through the wetlands of the Refuge. The Authority was not required to consider anew an alternative it had already considered and reasonably rejected.

E. *South of Livermore/Pleasanton*

The Authority rejected Setec's proposed alignment from the Altamont Pass to Fremont because it was similar to one already considered and rejected. That alternative

---

[14] Further, although not urged by the Authority, we find collateral estoppel bars review of this issue as well. In *Atherton I,* the trial court found substantial evidence supported the decision to reject placing the HST system over the old Dumbarton rail bridge. Petitioners fail to show how the inability to use the Union Pacific right-of-way affected this issue or otherwise that it is not identical to the issue decided in *Atherton I.*

alignment, "SR-84/South of Livermore," had been rejected because of its high impacts to the natural environment and agricultural lands. These included impacts to many endangered or threatened species. The route was also rejected because it was remote with respect to existing commuter routes and would not provide convenient access to downtown Livermore or Pleasanton.

Petitioners argue the two alignments are not the same because the Setec alternative avoided the Alameda Creek area. Further, Setec recommended mitigation measures similar to those used for high-speed rail through France's vineyards. Petitioners fault the Authority's reliance on a consultant's report that indicated only that the two locations were "similar" so that "it would appear" they would have the same high potential impacts.

Petitioners have failed to carry their burden to show the two routes are sufficiently dissimilar such that the Authority was required to consider the Setec alternative. They provide no detailed description of the differences and their vague references to varying maps fail to show significant differences. Further, while the Authority rejected the SR-84/South of Livermore alternative because of its impact on endangered or threatened species, the Setec report admits it lacks "geographic documentation that precisely locates habitats or endangered species" so it could not provide a comparison between the Altamont Pass and Pacheco Pass routes "about ecological habitat issues but only about potential of biodiversity." Thus, it does not dispel the concerns about the impact to threatened or endangered species.

Petitioners point out the Authority is considering this same south of Livermore route for an Altamont Corridor Rail Project. This project is intended to be "HST-compatible regional intercity passenger rail service." Petitioners contend use of this route for high-speed rail is contemplated and even if the use were to extend to only non "high speed" trains, this use would still adversely affect farmlands and wildlife habitat. They contend that since the Authority apparently believes that mitigation measures could be

48

adequate to make the Altamont Corridor Rail Project feasible, it was unreasonable for the Authority to find such measures would be inadequate mitigation for this particular project.

Petitioners' argument is based largely on speculation, that the Authority *might* adopt the south of Livermore/Pleasanton route for a slower train service and *might* find there are adequate mitigation measures. Such speculation fails to carry petitioners' burden to show the revised final PEIR was inadequate in its discussion of alternatives. Further, they fail to address the transportation problems that the Authority identified with this route.

F. *Fremont Area*

Setec proposed three possible routes through Fremont. Petitioners concede two are problematic, but assert the Authority's rejection of the third, via the Centerville line, as infeasible is not supported by substantial evidence. Petitioners contend the Authority rejected the Centerville alternative because it required the purchase of or conversion to exclusively passenger use of a short section of the Union Pacific Railroad right-of-way. They argue this position is inconsistent with the Authority's position as to use of other portions of the railroad's right-of-way. For example, petitioners argue that the Authority continued to consider the possible use of the Union Pacific right-of-way on the Peninsula.

The Fremont route using the Centerville line was discussed in the final PEIR. Petitioners do not allege they offered new information or that the Centerville route proposed by Setec was substantially dissimilar to one already considered. Instead, they question the Authority's reasoning for finding use of the Centerville line infeasible. The Authority's infeasibility findings, however, are entitled to great deference and are presumed correct. (*California Native Plant Society v. City of Santa Cruz, supra,* 177 Cal.App.4th at p. 997.) Substantial evidence supports rejecting an alternative that requires purchase of a portion of the Union Pacific Railroad's right-of-way in light of the railroad's express statement that the HST project should "not require the use of Union

49

Pacific operating rights-of-way or interfere with Union Pacific operations" and "the project should not be designed to utilize or occupy any of our rights of way." That the Authority believed it was necessary and feasible to negotiate with Union Pacific as to other portions of the alignment does not make its position as to the Centerville line in Fremont unreasonable. "The decisions of the agency are given substantial deference and are presumed correct. The parties seeking mandamus bear the burden of proving otherwise, and the reviewing court must resolve reasonable doubts in favor of the administrative findings and determination." (*Sierra Club v. County of Napa, supra,* 121 Cal.App.4th at p. 1497.)

Further, the Authority found additional problems with the Centerville line route-- the need for separate facilities for commuter trains and HST and the difficulty of providing a connection to BART.

G. *Other Proposals*

In a final argument, petitioners contend the Authority improperly dismissed consideration of other alignments proposed by Setec. First, they point to the various options Setec offered for connecting Fremont and San Jose. Setec admitted it had performed only a "superficial" study, but proposed alternatives that used a commuter rail line, used the right-of-way for a BART extension, or used the Interstate 880 corridor for an elevated structure. Petitioners decry the Authority's objection to a joint project with the commuter rail system. In its response to this portion of the Setec alternative, the Authority noted that regional commuter services would require regional investment and it "cannot unilaterally plan for regionally operated commuter services." Petitioners offer no response to this concern.

Finally, Setec proposed using an elevated structure over the Highway 101 corridor from the Dumbarton Bridge to San Francisco, noting the advantage that it could serve the San Francisco International Airport. The final PEIR had rejected using the Highway 101 corridor due to high construction costs and constructability issues. In response to this

50

portion of the Setec proposal, the Authority noted that Setec's evaluation was "extremely limited and preliminary." Also, Setec found a line dedicated to only the HST system advantageous to sharing tracks, but the Authority found sharing tracks would permit the Caltrain system to feed into the HST system and "provide much-needed synergy between Caltrain and HST to improve the corridor in a mutually beneficial, effective, and efficient manner." The Authority, however, did not again reject using the Highway 101 corridor. Its response indicated that the Highway 101 alignment would continue to be studied at the project level for the San Francisco to San Jose section.

Petitioners object to further study at the project level, rather than study at the program level as part of the Altamont Pass route. The Authority, however, has already rejected other portions of the Altamont Pass route. Petitioners have failed to show the consideration of alternatives was inadequate.

## DISPOSITION

The judgment is affirmed. The parties shall bear their own costs on appeal. (Cal. Rules of Court, rule 8.278(a)(5).)


                                                       DUARTE         , J.


We concur:


     BLEASE         , Acting P. J.


     MURRAY       , J.