Filed 4/15/26  Friends of New Helvetia Public Housing v. City of Sacramento CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| FRIENDS OF NEW HELVETIA PUBLIC HOUSING, | C102468 |
| Plaintiff and Appellant, | (Super. Ct. No. 34202080003490CUWMGDS) |
| v. | |
| CITY OF SACRAMENTO et al., | |
| Defendants and Respondents. | |

Appellant Friends of New Helvetia Public Housing (Friends) appeals a judgment denying their petition for writ of mandate under the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.).[1]  Friends challenge the Final

---

[1] Undesignated statutory references are to the Public Resources Code.  References to the "Guidelines" are to the CEQA Guidelines (Cal. Code Regs., tit. 14, § 15000 et seq.).  "In interpreting CEQA, we accord the Guidelines great weight except where they are clearly

Environmental Impact Report (EIR) for the West Broadway Specific Plan (specific plan), as certified by the City of Sacramento (City) as lead agency. Friends argue the EIR was inadequate for failing to study or adopt their proposal for an alternative design that would avoid or reduce the specific plan's impacts on historic resources, and the City's "approval findings" were not supported by substantial evidence. We will reject these arguments and affirm the judgment.

## I. BACKGROUND

### A. *The Specific Plan Area*

The specific plan addresses an area covering approximately 244 acres near downtown Sacramento (the specific plan area). The specific plan area is "bounded by the Sacramento River on the west, the centerline of Broadway on the north, Muir Way and 5th Street on the east, and 4th Avenue and Merkley Way on the south." It encompasses several distinct subareas, ranging from the Sacramento Marina and Miller Regional Park to subareas historically associated with heavy and light industrial uses. It also encompasses residential subareas, including two public housing communities owned by the Sacramento Housing and Redevelopment Agency (SHRA): Alder Grove and Marina Vista. This case principally concerns Alder Grove, the City's first major public housing project.

Alder Grove is located on the south side of Broadway between Muir Way and 5th Street. Built in 1942, Alder Grove consists of 360 multi-family units within 61 apartment buildings, laid out in a rectilinear grid with streets, pedestrian walkways, and a large central open space area. Portions of Alder Grove have been listed on the National Register of Historic Places (NRHP) and the California Register of Historic Resources (CRHR) as the New Helvetia Historic District (New Helvetia). New Helvetia is

unauthorized or erroneous." (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 428, fn. 5 (*Vineyard*).)

historically significant for several reasons, including its association with Nathanial S. Colley, "a prominent African American civil rights attorney who advocated for fair housing in Sacramento and nationally during the 1960s and 1970s." [2]

The specific plan area evolved in ad hoc fashion, resulting in a patchwork of disparate land uses. This organic growth pattern can be seen in its irregular street layout, which features "dead-end roadways and driveways that serve discrete land uses and do not connect with the surrounding street grid." The specific plan proposes to revitalize the specific plan area—and make it more accessible to surrounding areas—by providing "a framework for re-stitching the disconnected circulation patterns and disparate land uses that exist today into a cohesive, contemporary neighborhood."

B.      *The Specific Plan*

"Every city is required to adopt a comprehensive, long-term general plan for the physical development of the city." (*Beck Development Co. v. Southern Pacific Transportation Co.* (1996) 44 Cal.App.4th 1160, 1195 (*Beck Development*).) The general plan becomes "a ' "constitution" for future development' [citation], located at the top of 'the hierarchy of local government law regulating land use.' " (*DeVita v. County of Napa* (1995) 9 Cal.4th 763, 773.) The City's general plan was adopted in March 2015 (the general plan) and serves as "a 20-year policy guide for the physical, economic, and environmental growth and renewal of the city, and it is the principal tool for the City to use in evaluating public and private building projects and municipal-service improvements."

---

[2] New Helvetia also represents "an important local attempt to improve the housing conditions of African Americans through public housing," and "the collaborative product of a number of prominent Sacramento architects."

"After adoption of a general plan, a city may adopt, by resolution or ordinance, a specific plan or plans for the systematic implementation of the general plan for all or part of the city.  [Citations.]  A specific plan must be consistent with the city's general plan.  [Citation.]  Among other things, a specific plan must contain standards and criteria by which development will proceed, and a program of implementation including regulations, programs, public works projects, and financing measures."  (*Beck Development, supra*, 44 Cal.App.4th at p. 1196.)

The specific plan at issue here was developed over several years, in a process that involved neighborhood meetings, community workshops, and meetings of the City's planning and design commission, parks and community enrichment commission, active transportation commission, and city council.  The specific plan "describes the long-term vision and land use, circulation, infrastructure, and urban design framework to guide future growth within the [specific plan] area."  The specific plan's objectives include: (1) promoting new infill residential development and redevelopment that supports a variety of housing choices, from market rate to affordable housing for low-income households; (2) facilitating new mixed-use development and redevelopment within industrial subareas; (3) enhancing bike and pedestrian travel ways through the specific plan area; and (4) providing "a gridded street network that improves connectivity and access within the [s]pecific [p]lan [a]rea to surrounding uses and neighborhoods."  The present dispute focuses on the last of these objectives.

The specific plan does not propose any particular project or development in Alder Grove.  It instead "provides flexibility for a range of options for the Alder Grove subarea, from infill development that supports the retention and adaptive reuse of historic properties to significant or complete demolition and development of the Alder Grove site into a mixed-income community."  Within that range, the specific plan assumes an increase of 570 housing units, three acres of new parks and open space land, 34,000 square feet of commercial development, and a new community building spanning 6,000

4

square feet. It also calls for "the establishment of a coordinated and cohesive street grid system through the entire West Broadway area."

C.    *The EIR*

An EIR was prepared for the specific plan. A draft EIR was circulated for public comment between December 2019 and February 2020. The final EIR was released in April 2020. The final EIR includes revisions to the draft EIR, responses to public comments, a mitigation monitoring plan for the specific plan, and various appendices.[3] (Guidelines, § 15132.)

The EIR is a program EIR, rather than a project EIR. "A program EIR is an EIR which may be prepared on a series of actions that can be characterized as one large project and are related either: [¶] (1) Geographically, [¶] (2) As logical parts in the chain of contemplated actions, [¶] (3) In connection with issuance of rules, regulations, plans, or other general criteria to govern the conduct of a continuing program, or [¶] (4) As individual activities carried out under the same authorizing statutory or regulatory authority and having generally similar environmental effects which can be mitigated in similar ways." (Guidelines, § 15168.) "A 'program' EIR allows an agency to 'first analyze[] "general matters contained in a broader [initial] EIR . . . with later EIRs . . . [analyzing] narrow projects." ' " (*Make UC a Good Neighbor v. Regents of University of California* (2024) 16 Cal.5th 43, 50, fn. 7.)

The EIR identifies and analyzes potential environmental impacts of the specific plan, including impacts to historic resources. (See generally *Eureka Citizens for Responsible Government v. City of Eureka* (2007) 147 Cal.App.4th 357, 374 ["A 'historical resource' is one listed in, or eligible for listing in the California register of historical resources; a resource included in a local register of historical resources (unless

---

[3] Unless otherwise indicated, we refer to the draft EIR and final EIR collectively as the EIR.

the preponderance of the evidence demonstrates that it is not historically or culturally significant); any object, building, structure, site, area, place, record, or manuscript which a lead agency determines to be historically significant, if the lead agency's determination is supported by substantial evidence"]; see also Guidelines, § 15064.5, subd. (b) ["A project with an effect that may cause a substantial adverse change in the significance of [a] historical resource is a project that may have a significant effect on the environment"].) It is undisputed that New Helvetia qualifies as a historical resource.

The EIR acknowledges that redevelopment of Alder Grove could involve "demolition of buildings" and "result in significant effects to historical resources." "For example," the EIR says, "the realignment of Muir Way to 8th Street (north of Broadway) would likely result in the removal of existing structures within Alder Grove." Furthermore, the EIR continues, "[d]amage to or destruction of a building or structure that is a designated historical resource, eligible for listing as a historical resource, or a potential historical resource that has not yet been evaluated, could result in the change in its historical significance." "Therefore," the EIR concludes, the specific plan's "impact to historical resources would be **potentially significant**."

"Once a significant environmental effect has been identified, 'the EIR must propose and describe mitigation measures that will minimize the significant environmental effects that the EIR has identified.' " (*Center for Biological Diversity v. County of Los Angeles* (2025) 112 Cal.App.5th 317, 352 (*Center for Biological Diversity*).) The EIR proposes several measures to reduce the specific plan's impacts on historical resources, which are collectively designated as "[m]itigation [m]easure 4.4-1."

Mitigation measure 4.4-1 requires that the City consult an architectural historian and "consider measures that would enable the project to avoid direct or indirect impacts" before altering or otherwise affecting a district or building that has already been designated as a historical resource, such as New Helvetia or buildings within New Helvetia. Such future measures could include "preserving a building on the margin of the

6

project site, using it 'as is,' or other measures that would not alter the building or substantially affect the overall integrity of the historical resource."

If the project cannot avoid modifications to a historic resource, the EIR requires that the City call for the implementation of three additional measures, "to the extent feasible." First, if a building or structure can be preserved on site, but remodeling or other alterations are required, the EIR requires that the work be conducted in compliance with the Secretary of the Interior's Standards for the Treatment of Historic Properties (Secretary's Standards). (See 36 C.F.R. ch. I, part 68; see also Guidelines, § 15064.5, subd. (b)(3) [a project that follows the Secretary's Standards "shall be considered as mitigated to a level of less than a significant impact on the historical resource"].) Second, if a significant historic building or structure is proposed for major alteration or renovation, or to be moved or demolished, the EIR requires that the City ensure that an architectural historian thoroughly document the building and associated landscaping and setting. Third, if preservation and reuse at the site are infeasible, the EIR requires that the building be documented as described above and, "when physically and financially feasible," moved and preserved or reused in a manner consistent with the Secretary's Standards.

The EIR concludes that mitigation measure 4.4-1 would "reduce potentially significant impacts to historical resources because actions would be taken to record, evaluate, avoid, or otherwise treat the resource appropriately, in accordance with pertinent laws and regulations." At the same time, the EIR recognizes that "documentation of [a] historical resource will not mitigate the effects of demolition of that resource to a less-than-significant level because the historical resources would no longer exist." What's more, the EIR acknowledges, if buildings listed on the National Register of Historic Places or California Register of Historic Resources are altered or demolished, such resources "would be unavoidably impacted." "Therefore," the EIR

7

concludes, "because the potential for permanent loss of a historical resource or its integrity cannot be precluded, impacts would remain **significant and unavoidable.**"

The EIR analyzes three alternatives to the specific plan, each intended to minimize or avoid the specific plan's potentially significant adverse impacts. (See generally *In re Bay-Delta etc.* (2008) 43 Cal.4th 1143, 1163 (*Bay-Delta*) ["CEQA requires that an EIR, in addition to analyzing the environmental effects of a proposed project, also consider and analyze project alternatives that would reduce adverse environmental impacts"]; see also Guidelines, § 15126.6, subd. (a) [An EIR must "describe a range of reasonable alternatives to the project . . . which would feasibly attain most of the basic objectives of the project but would avoid or substantially lessen any of the significant effects of the project"].) The first alternative, known as "Alternative 1" or the "No Project-Existing General Plan Alternative" (no project alternative), assumes that no specific plan would be adopted for the specific plan area. Under the no project alternative, "[e]xisting structures would be maintained in their current condition and would only modified in response to specific developments proposed by individual landowners within the [s]pecific [p]lan [a]rea," consistent with the general plan.

The second alternative, known as "Alternative 2" or the "Historic Preservation Alternative" (historic preservation alternative), contemplates that "historic structures within the [s]pecific [p]lan [a]rea would be preserved and retained, with some modernization." Under the historic preservation alternative, "planned roadway network improvements within Alder Grove and Marina Vista, including the realignment of Muir Way, would not occur."

The third alternative, known as "Alternative 3" or the "Lesser Density Development Alternative" (lesser density alternative), assumes that most of the specific plan area would be developed at a lower population density, with approximately 30 units per acre of residential units and 1,000 square feet per acre of retail commercial building

8

area, resulting in a potential net change of 2,700 new residential units and a decrease in commercial/industrial building area of 313,000 square feet.

The EIR concludes that all of the analyzed alternatives would achieve most of the specific plan's objectives, but "they would not achieve many of the objectives to the extent of the [specific plan], including the provision of a variety of housing choices, enhancing the West Broadway corridor as a gateway to the City, and improving the street grid connections within the [s]pecific [p]lan [a]rea. Therefore, when considering objectives," the EIR concludes the specific plan "would best meet the purpose and need for the plan."

D.    *The CAW Plan*

An organization called the Nathaniel S. Colley, Sr. Civil Rights Coalition (the Coalition) transmitted a letter to the City in June 2020, some two months after the final EIR was released. The letter argues the EIR fails to consider a reasonable range of alternatives to the specific plan (then still in draft form), and asks the City to amend the plan to "provide an alternative to the needless destruction of the New Helvetia Historic District (aka Alder Grove)."

The letter encloses what appears to be a slide presentation by architecture firm Cody Anderson & Wasney (CAW) Architects entitled, "New Helvetia Historic District Development Study." The parties call the enclosure the "CAW Plan," and we will follow their lead.

The CAW Plan opines that the specific plan calls for the demolition of New Helvetia and the new street grid would require "demolition of the entire historical site." The CAW Plan proposes an alternative approach to development of the Alder Grove subarea, which would increase housing density through the use of "podium buildings" (i.e., newly constructed buildings added to what are now open space areas between existing buildings). The CAW Plan also proposes to "extend[] existing streets to protect historic buildings" and provide "new street connectivity to Broadway, Muir Way and

9

west edge." The CAW Plan declares that all of these objectives could be achieved with less demolition than contemplated by the specific plan. The Coalition's letter urges the City to consider the CAW Plan in a recirculated EIR.

E.     *Response to the CAW Plan*

City staff prepared a response to the CAW Plan, which was attached to a staff report to the planning and design commission in July 2020 (the response). The response summarizes the previously described alternatives to the specific plan, focusing on the historic preservation alternative.

The response allows that the CAW Plan would produce greater housing density and require less demolition than the historic preservation alternative. However, the response notes both would entail some demolition of historic buildings, and neither would accomplish the objective of providing "a gridded street network that improves the connection and access within the [s]pecific [p]lan [a]rea to surrounding uses and neighborhoods." Furthermore, the response explains, the CAW Plan's use of podium buildings could "dramatically redefine the spatial relationships" that characterize New Helvetia, and compromise "the design integrity of the district as a whole (e.g., the relationship of built elements to one another with respect to vistas, open space integration and circulation, as well as the direct losses of landscape features)," such that "the continued listing of the property on the NRHP might be called into question by the Keeper of the Register." Accordingly, the response concludes the CAW Plan "would likely result in significant, unavoidable impacts to historic resources." The response further concludes the CAW Plan "does not propose any potential environmental effects that were not already considered in an analyzed alternative" and "recirculation of the EIR is not required."

These conclusions aside, the response recognizes that some members of the public may have understood the then-current draft of the specific plan to call for demolition and redevelopment of New Helvetia. The response observes that the specific plan could be

10

revised to clarify that no such demolition is required. The response explains: "The intent of the Specific Plan is to provide a long-term vision for this area and therefore, provides a plan that acknowledges that SHRA may choose to demolish the Alder Grove site. However, SHRA could choose to pursue a plan, such as that presented by the Colley Coalition. The Specific Plan retains flexibility for a range of future options and does not require SHRA to commit to a future action at this time. A concept, such as the one presented by the Colley Coalition could be accommodated under the [s]pecific [p]lan."

F.      *Revisions to the Specific Plan*

The specific plan was revised in July 2020. According to a city council report dated August 25, 2020 (the report), the revisions were intended to "[c]larify" "that the [s]pecific [p]lan does not require demolition of the New Helvetia Historic District[,] and [¶] . . . that the [s]pecific [p]lan policies, guidelines, and standards apply to a range of potential outcomes for the Alder Grove subarea from preservation and refurbishment of historic structures (and preservation of the New Helvetia Historic District) to complete demolition of the existing site and development of a mixed-income community (including the potential demolition of the New Helvetia Historic District)." The report adds, "revisions have been made to the [s]pecific [p]lan, however, these do not constitute significant new information for the purposes of CEQA Guidelines section 15088.5 and therefore recirculation is not required."

G.      *The City Approves the Specific Plan and Certifies the EIR*

The City approved the specific plan and certified the EIR in August 2020. The City adopted a statement of overriding considerations, findings of fact and a mitigation monitoring plan as part of the approval process. With respect to the specific plan's impacts on historic resources, the City found the required mitigation measures "would not be sufficient to reduce the impact to less than significant." Nevertheless, the City determined the specific plan's "social, economic, and environmental benefits" outweighed any unavoidable significant impacts. Accordingly, the City adopted a

11

statement of overriding considerations declaring, in part:  "Having reduced the effects of the project by adopting all feasible mitigation measures, and balanced the benefits of the project against the project's significant and unavoidable adverse environmental impacts, the City . . . hereby determines that the specific overriding housing, transportation access, sustainability, or other benefits of the project set forth above outweigh the potential unavoidable adverse effects of the project."

## H.     Trial Court Proceedings

Friends, an unincorporated association formed in September 2020, filed a petition for writ of mandate that same month.  The petition asserts a single cause of action for violations of CEQA, alleging the City abused its discretion by certifying the EIR "with inadequate project objectives; insufficient analysis of significant project impacts; insufficient identification and analysis of potentially feasible mitigations; and insufficient identification and analysis of a reasonable range of alternatives."  The petition also alleges the City's statement of overriding considerations and findings of fact as to the feasibility of mitigation measures and project alternatives are not supported by substantial evidence.

The trial court denied the petition in a tentative ruling issued July 15, 2024.  Following argument, the trial court affirmed the tentative ruling and entered judgment for the City.  This appeal timely followed.

## II.  DISCUSSION

Before we begin, a word on the briefing.  Although Friends are represented by experienced CEQA counsel, their arguments are conspicuously underdeveloped and difficult to discern.  Rather than explain how CEQA might have been violated, Friends' opening brief offers lengthy excerpts from the administrative record followed by formulaic recitations of black letter law.  The opening brief makes little effort to apply the law to the facts or support any argument with meaningful legal analysis.  Some of Friends' arguments are not tethered to any legal doctrine at all, leaving us to speculate

12

what the ground for reversal might be. Other arguments are scattered throughout the briefs but nowhere set forth "under a separate heading or subheading summarizing the point." (Cal. Rules of Court, rule 8.204(a)(1)(B).) We need not consider these arguments. (See generally *In re S.C.* (2006) 138 Cal.App.4th 396, 408 ["When a point is asserted without argument and authority for the proposition, 'it is deemed to be without foundation and requires no discussion by the reviewing court' "]; and see *Pizarro v. Reynoso* (2017) 10 Cal.App.5th 172, 179 ["Failure to provide proper headings forfeits issues that may be discussed in the brief but are not clearly identified by a heading"].) Accordingly, we decline to consider Friends' argument that the specific plan violates CEQA by streamlining demolition of New Helvetia or end-running CEQA's requirement that the City make infeasibility findings before adopting a statement of overriding conditions. (§ 21081, subd. (a).)

Reading the opening brief generously, we discern two cognizable arguments: (1) that the EIR fails to adequately study and adopt feasible mitigation measures or project alternatives (namely, the CAW Plan); and (2) that the City's "approval findings" are not supported by substantial evidence. Neither argument succeeds, as we next explain.

A.     *CEQA Overview and Standard of Review*

"CEQA is a comprehensive scheme designed to provide long-term protection to the environment." (*Mountain Lion Foundation v. Fish & Game Commission* (1997) 16 Cal.4th 105, 112 (*Mountain Lion*).) "CEQA contains a 'substantive mandate' requiring public agencies to refrain from approving projects with significant environmental effects if 'there are feasible alternatives or mitigation measures' that can substantially lessen or avoid those effects." (*County of San Diego v. Grossmont-Cuyamaca Community College Dist.* (2006) 141 Cal.App.4th 86, 98 (italics omitted).) However, "[a] public agency may approve a project that will have a significant effect on the environment if the agency finds that: (1) '[s]pecific economic, legal, social, technological, or other considerations . . . make infeasible the mitigation measures or alternatives identified in the [EIR],' and (2)

13

the significant effects on the environment are outweighed by 'specific overriding economic, legal, social, technological, or other benefits of the project.' " (*Los Angeles Conservancy v. City of West Hollywood* (2017) 18 Cal.App.5th 1031, 1041.)

The EIR is often described as " 'the heart of CEQA.' " (See, e.g., *Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 392; see also *Cleveland National Forest Foundation v. San Diego Assn. of Governments* (2017) 3 Cal.5th 497, 511 (*Cleveland National Forest*); and see *Bay-Delta, supra*, 43 Cal.4th at p. 1162.) " 'A public agency must prepare an EIR or cause an EIR to be prepared for any project that it proposes to carry out or approve that may have a significant effect on the environment' [Citation.] 'The EIR must describe the proposed project and its environmental setting, state the objectives sought to be achieved, identify and analyze the significant effects on the environment, state how those impacts can be mitigated or avoided, and identify alternatives to the project, among other requirements.' " (*California Native Plant Society v. City of Santa Cruz* (2009) 177 Cal.App.4th 957, 979 (*California Native Plant*).)

"When an EIR identifies significant effects on the environment if a project is approved, the agency must make specific findings regarding potential mitigation measures or alternatives and their feasibility. [Citation.] 'A "mitigation measure" is a suggestion or change that would reduce or minimize significant adverse impacts on the environment caused by the project as proposed.' [Citation.] 'Mitigation measures are modifications of the proposed design and implementation of a project imposed by the lead agency to reduce the project's adverse environmental effects. If an EIR identifies significant environmental effects, CEQA requires the adoption of mitigation measures when "it is feasible to do so." ' " (*Center for Biological Diversity, supra*, 112 Cal.App.5th at p. 333.)

"CEQA findings are 'required under . . . section 21081, subdivision (a), for each significant effect noted in the draft.' [Citation.] Specifically, 'the agency must find that

14

the project's significant environmental effects have been mitigated or avoided [citation], that the measures necessary for mitigation "are within the responsibility and jurisdiction of another public agency and have been, or can and should be, adopted by that other agency" [citation], and/or that "specific economic, legal, social, technological, or other considerations" render mitigation "infeasible." ' [Citation.] To move forward with a project where mitigation is infeasible, the lead agency must find that ' "specific overriding economic, legal, social, technological, or other benefits of the project outweigh the significant effects on the environment." ' [Citations.] A statement of overriding considerations 'is required in CEQA approved projects to show that the Project's significant environmental effects have been identified, and avoided or mitigated, or that unmitigated effects will be outweighed by the Project's benefits.' " (*Center for Biological Diversity, supra*, 112 Cal.App.5th at pp. 333-334.)

" 'An appellate court's review of the administrative record for legal error and substantial evidence in a CEQA case . . . is the same as the trial court's: The appellate court reviews the agency's action, not the trial court's decision' to determine whether the agency prejudicially abused its discretion. [Citations.] The agency abuses its discretion if it has not proceeded in a manner required by law or if its factual determinations or decision are not supported by substantial evidence." (*Center for Biological Diversity, supra*, 112 Cal.App.5th at p. 334.)

"In reviewing an agency's decision for compliance with CEQA, we determine de novo whether the agency employed proper procedures, and we review the agency's factual findings and statement of overriding considerations for substantial evidence. [Citations.] 'In evaluating an EIR for CEQA compliance, . . . a reviewing court must adjust its scrutiny to the nature of the alleged defect, depending on whether the claim is predominantly one of improper procedure or a dispute over the facts.' " (*Center for Biological Diversity, supra*, 112 Cal.App.5th at p. 334.) "While we determine de novo whether the agency has employed the correct procedures, 'scrupulously enforc[ing] all

15

legislatively mandated CEQA requirements' [citation], we accord greater deference to the agency's substantive factual conclusions." (*Vineyard, supra*, 40 Cal.4th at p. 435.)

B.      *The City Was Not Required to Study or Adopt the CAW Plan*

Friends argue the EIR violates CEQA by failing to study or adopt feasible mitigation measures or alternatives to the specific plan.  Friends are coy about which mitigation measures or project alternatives they believe should have been considered. They repeatedly suggest the CAW Plan was one of several suggestions for reducing or avoiding demolition in New Helvetia.  But they do not identify any other suggestion that should have been considered.  Accordingly, we understand Friends to argue the EIR violates CEQA by failing to study or adopt the CAW Plan as an alternative or mitigation measure.  That argument fails for any number of reasons.  We will focus on two of them.

First, we note that Friends view project alternatives and mitigation measures as interchangeable or, in their words, "a distinction without meaningful difference."  That perspective is not unreasonable, given that project alternatives and mitigation measures generally serve similar purposes.  For example, reduced demolition (such as that contemplated by the CAW Plan) may sometimes be characterized as an alternative and other times as a mitigation measure, depending on the circumstances.  As always, labels are less important than substance.  (See generally *City of Rancho Palos Verdes v. City Council* (1976) 59 Cal.App.3d 869, 893 ["The description of the option [of constructing a smaller commercial area than originally proposed] as a 'mitigating measure,' rather than an 'alternative,' is not significant"]; see also *Dusek v. Redevelopment Agency* (1985) 173 Cal.App.3d 1029, 1044 ["we look to substance rather than labels" when examining compliance with CEQA].)[4]

_____

[4]  Given the elusive nature of the distinction between mitigation measures and project alternatives, we reject the City's contention that Friends failed to exhaust administrative

16

But the differences between project alternatives and mitigation measures become important where, as here, the proffered alternative addresses only one part of the project. As the City observes, and Friends appropriately concede, CEQA requires that the lead agency consider alternatives to the project as a whole, not components thereof. (See *California Native Plant, supra,* 177 Cal.App.4th at p. 993; see also *Big Rock Mesas Property Owners Assn. v. Board of Supervisors* (1977) 73 Cal.App.3d 218, 227 ["The pertinent statute and EIR guidelines require that an EIR describe alternatives to the proposed *project*. [Citation.] We interpret such requirement as applicable only to the project as a whole, not to the various facets thereof"].) The CAW Plan only addresses New Helvetia, not the specific plan area as a whole and thus does not constitute an alternative to the specific plan. Consequently, the City was not required to consider the CAW Plan as an alternative in the EIR. (1 Kostka & Zischke, Practice Under the California Environmental Quality Act (Cont.Ed.Bar 2d ed. 2015 supp.) § 15.15, p. 15-23 (1 Kostka & Zischke) ["An EIR . . . need not consider an alternative addressed to an ancillary facet of a project"].)

Second, we observe the CAW Plan was transmitted to the City in June 2020, after the close of the public comment period in February 2020. Although neither party addresses the issue, ample authority exists for the proposition that lead agencies need not respond to late comments. (See, e.g., *Gray v. County of Madera* (2008) 167 Cal.App.4th 1099, 1110 ["Under CEQA, the lead agency may, but is not required to, respond to late comments"]; *Chico Advocates for a Responsible Economy v. City of Chico* (2019) 40 Cal.App.5th 839, 852, fn. 9 ["CEQA does not require an agency to respond to comments that are received after close of the designated public review period"]; see also Guidelines, § 15207 ["Although the lead agency need not respond to late comments, the lead agency

remedies with respect to their argument that the City should have considered the CAW Plan as a mitigation measure.

17

may choose to respond to them"]; and see 1 Kostka & Zischke, *supra*, § 15.42, at p. 15-49 ["Although a lead agency may respond to comments after the close of the period for comment on the draft EIR, it is not required to do so"].)

Applying these authorities, we conclude the City had no obligation to consider or respond to the CAW Plan. (*Gray v. County of Madera, supra*, 167 Cal.App.4th at p. 1111.) That being so, the EIR could not have been inadequate for failing to analyze or respond to the CAW Plan. (*Ibid.* ["because the Board never had a legal duty to respond to late comments, the inadequacy of the Board's responses to the late comments is not sufficient to render approval of the CEQA project ineffective or contrary to law"]; see also 2 Kostka & Zischke, Practice Under the California Environmental Quality Act (Cont.Ed.Bar 2d ed. 2015 supp.) § 16.12, at p. 16-15 (2 Kostka & Zischke) ["Given that there is no legal duty to respond to late comments, the claimed inadequacy of responses to late comments cannot be a basis for challenging the legal adequacy of an EIR"].) We therefore reject Friends' first argument—that the City violated CEQA by failing to study or adopt the CAW Plan as an alternative to the specific plan or mitigation measure.

In any event, the City considered the CAW Plan in the response, which was referenced in the City's findings of fact and incorporated into the administrative record. (See *Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 567 [reviewing court may appropriately consult administrative record as a whole to assess agency's response to late comments]; 2 Kostka & Zischke, *supra*, § 16.12, at p. 16-15 [responses to late comments "may be included in a staff report, in staff testimony, or a consultant's report"].) That brings us to Friends' second argument, to which we now turn.

C.      *Friends' Challenge to the City's "Approval" Findings Fails*

Friends next argues the City's "approval findings" were not supported by substantial evidence. Friends are characteristically vague as to which findings supposedly lack support. Their opening brief suggests only one possibility: the City's

18

claim in the statement of overriding considerations to have "reduced the effects of the project by adopting all feasible mitigation measures." Although not entirely clear from their briefing, we understand Friends to argue the statement of overriding considerations was not supported by substantial evidence because the City failed to adopt the CAW Plan, which they say was feasible. Stated another way, we understand Friends to challenge the City's implied finding that the CAW Plan was infeasible. That argument, to the extent we understand it, goes nowhere.

"Under CEQA, the public agency bears the burden of affirmatively demonstrating that, notwithstanding a project's impact on the environment, the agency's approval of the proposed project followed meaningful consideration of alternatives and mitigation measures." (*Mountain Lion, supra*, 16 Cal.4th at p. 134.) The agency may not approve a project with significant environmental impacts "if there are feasible alternatives or feasible mitigation measures available which would substantially lessen" the project's significant environmental impacts. (§ 21002.) " 'Feasible' means capable of being accomplished in a successful manner within a reasonable period of time, taking into account economic, environmental, social, and technological factors." (§ 21061.1; see Guidelines, § 15364.)

Having determined that the specific plan would have significant impacts on historic resources, the City was required to identify and discuss feasible mitigation measures and project alternatives. (§ 21002; *Center for Biological Diversity, supra*, 112 Cal.App.5th at p. 352.) As previously discussed, the EIR proposes mitigation measure 4.4-1, which requires compliance with the Secretary's Standards, documentation of historic resources, and the relocation and preservation of historic buildings, "when physically and financially feasible." The EIR also considers three project alternatives, including the historic preservation alternative, which would preserve historic structures within the specific plan area and retain the existing street grid, much as the CAW Plan proposes. Again, Friends do not identify any additional mitigation measure or project

19

alternative the EIR should have considered or discussed, other than the untimely CAW Plan.

The City considered the CAW Plan in the response. The response acknowledges the CAW Plan would require less demolition than the specific plan. However, the response determines the CAW Plan would still require some demolition and the introduction of new podium buildings into existing open spaces would compromise New Helvetia's design integrity and raise questions about its continued listing on the NRHP. The response also determines the CAW Plan would not accomplish the specific plan's objective of providing "a gridded street network that improves the connection and access within the Specific Plan Area to surrounding uses and neighborhoods." These determinations are referenced in the City's findings of fact and support the implied finding that the CAW Plan was infeasible. (See, e.g., *Foundation for San Francisco's Architectural Heritage v. City and County of San Francisco* (1980) 106 Cal.App.3d 893, 913 [alternative proposed after close of comment period impliedly found infeasible].)

An agency may reject mitigation measures or project alternatives that are infeasible, so long as the finding of infeasibility is supported by substantial evidence in the record. (*Town of Atherton v. California High-Speed Rail Authority* (2014) 228 Cal.App.4th 314, 353 (*Town of Atherton*).) An agency's infeasibility findings "are entitled to great deference and are presumed correct." (*Ibid.*) " 'The parties seeking mandamus bear the burden of proving otherwise, and the reviewing court must resolve reasonable doubts in favor of the administrative findings and determination.' " (*Ibid.*) Friends do not come close to carrying that burden.

Friends suggest the City's infeasibility findings are conclusory. Their argument amounts to an instance of the pot calling the kettle black. Friends do not address the City's determination that the CAW Plan would entail demolition of historic structures in New Helvetia. They do not challenge the City's determination that the CAW Plan would so dramatically change New Helvetia as to threaten its continued listing on the NHRP.

20

Nor do they challenge the City's determination that the CAW Plan would not achieve the objective of providing a gridded street network in the specific plan area. Ignoring their burden, Friends simply cut and paste the discussion of the CAW Plan from the resolution adopting the specific plan and declare it inadequate. This approach to appellate advocacy is itself inadequate. (See *Town of Atherton, supra*, 228 Cal.App.4th at p. 353.) We reject Friends' substantial evidence challenge to the City's implied finding that the CAW Plan was infeasible.

## III. DISPOSITION

The judgment denying the petition for writ of mandate is affirmed. Respondents are entitled to recover their reasonable costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1) & (2).)

/S/

_____

RENNER, Acting P. J.

We concur:

/S/

_____

BOULWARE EURIE, J.

/S/

_____

FEINBERG, J.